**In re Joni Adele Bush BARROWS, Debtor.**

**Joni Adele Bush BARROWS, Plaintiff,**

**v.**

**ILLINOIS STUDENT ASSISTANCE COMMISSION, Student Loan Marketing Association, U.S. Dept. of Health and Human Services, James F. Patton, in his official capacity as Director of Health Care Administrative Sanctions Dept. of Health and Human Services, Defendants.**

**Bankruptcy No. 92–11637–JEY.**

**Adv. No. 92–1157.**

United States Bankruptcy Court, D. New Hampshire.

Oct. 17, 1994.

3. BIG concedes that Cadle stands in FDIC's shoes. *Plaintiff's Supplemental Memorandum* 3.

642

Joni Adele Bush Barrows, Newmarket, NH, David Broderick, Gretchen Leah Witt, Asst. U.S. Attys., Concord, NH, for U.S.

Victor Dahar, Manchester, NH, Terrie Harman, Harman Law Offices, Portsmouth, NH, for Joni Barrows.

Mary Ellen Goggin, Portsmouth, NH, David Hershman, Chicago, IL, for Illinois Student Assistance Com'n.

Geraldine Karonis, Manchester, NH, for E. Franklin Childress, Jr.

Elaine Marzetta Lacy, U.S. Dept. of Justice, Asst. U.S. Atty., Concord, NH, for James Patton, Dir. Health Care Admin., U.S., U.S. Dept. of Health & Human Services.

Nancy J. Smith, Asst. Atty. Gen.–Civil Bureau, Dept. of Justice, Concord, NH, Student Loan Mktg. Assn., Merrifield, VA, Student Loan Mktg. Assn., Waltham, MA, Student Loan Mktg. Assn., Wilkes Barre, PA, for NH Bd. of Dental Examiners, Raymond Jarvis, Exec. Sec., NHBDE, NH Dept. of Health & Human Services, Harry Bird, Dir. NH Dept. of Health.

## MEMORANDUM OPINION

JAMES E. YACOS, Chief Judge.

Like most, Joni Barrows borrowed money to finance her professional education. On the date of her graduation from Marquette University dental school in May of 1987, Dr. Barrows owed a total of $78,845.00 [1] under the Health Education Assistance Loan program (hereinafter "HEAL" loans) and approximately $20,000 [2] in Guaranteed Student Loans from the State of Illinois.

The HEAL loans began accruing interest at a rate between 13% and 15% from the date of issuance with unpaid interest added to the principal every six months [3]. Payment of the total amount due was to begin on March 1, 1988 and would continue for 10 to 33 years from the date of issuance of each loan.

As of the first day of this adversary trial on August 9, 1993, Dr. Barrows owed a total of $186,174.71 in HEAL loans [4]. The United

---

1. See Annex A for complete summary of HEAL loans.

2. See debtor's schedules filed June 18, 1992, schedule F—Creditors Holding Unsecured Nonpriority Claims. Debtor lists loan from Illinois Student Assistance Commission as "Guaranteed Student Loan—GSL; As resident of State of Illinois; Original lender; $5,000 yr × 4 yrs; plus additional interest and charges. $20,000.00 approx."

3. Under these terms, the total amount of the debtor's unpaid loans more than doubled in approximately 6 years. At the hearing held August 9, 1993, the Court ruled that these terms are not per se unconscionable.

4. The debtor has five HEAL loans. Three are WHEAL loans originally obtained from the Wisconsin Higher Education Assistance Board and subsequently assumed by the United States as guarantor of the loans. The two remaining HEAL loans were obtained through the Student Loan Marketing Association (SLMA), established under the Higher Education Act of 1965, 20 U.S.C. § 1071 et seq. The original amount of the three WHEAL loans totaled $55,000. In March, 1991, a state court judgment was entered against the debtor on the WHEAL debt in the amount of $111,755.88 accruing interest at 12%. (Govt. Exhibit No. 114). As of the date of trial, the amount owed had risen to $143,004.71. The original amount of the two SLMA loans totals $23,845. These loans have not been reduced to judgment and are currently subject to a quarterly

States proposed a repayment agreement [5] establishing Dr. Barrows debt at $173,818.00 with interest accruing at the lesser of 6.21% or the federal judgment rate at the time a consent judgment and repayment agreement is reached in an appropriate federal district court civil action after a determination of nondischargeability by this Court (Court Doc. No. 62). The proposed term of repayment would be approximately 14 years with progressively increasing monthly payments tied to the anticipated growth of Dr. Barrow's dental practice. It also takes into account the debtor's obligations under an agreement with the Internal Revenue Service for the recovery of unpaid payroll trust fund taxes.

The Guaranteed Student Loans (GSL) became due on November 30, 1987. On June 8, 1992, the Illinois Student Assistance Commission (hereinafter the "Commission") filed a proof of claim in the amount of $27,220.67 accruing 9% interest annually. On September 27, 1993, the Commission filed a proposed repayment of the outstanding debt as of that date. The Commission's repayment proposal suggested that fifty percent of the total amount owed as of September 27, 1993 [6] or $14,102.50 would be repaid at $100 per month with no interest accruing as long a payments were timely made. Under the proposal, the Commission in effect would forbear with regard to collecting the other 50 percent, and ultimately would forgive that amount, unless the debtor became 60 days delinquent on any one payment at which point the entire unpaid amount and all interest which would have accrued would become due.

The debtor has not responded to any of the proposals for repayment with any counter-proposal of her own. Instead, the debtor contends that *any* payment on *any* of her educational loan debt is an undue hardship or unconscionable. She has not agreed to the terms of the proposed repayment plans or in fact responded in any meaningful way with the lenders to devise an acceptable program at any time before or during this proceeding.[7]

*Procedural History*

The debtor filed her chapter 7 petition in bankruptcy on May 22, 1992. On September 4, 1992, the United States Trustee filed a motion to dismiss for bad faith stating the petition was filed solely as an attempt to discharge her non-dischargeable student loans.[8] The debtor objected to the Trustee's motion and on September 4, 1992, by joint motion of the parties, the Court deemed the contested matter an adversary proceeding pursuant to Bankruptcy Rule 9014 and 11 U.S.C. § 105. On December 11, 1992, the debtor filed a Third Party Complaint requesting a "hardship" and "unconscionability" discharge of her student loans as referenced in 11 U.S.C. § 523(a)(8) and 42 U.S.C. § 292f(g) as to the respective loans; sanctions against certain third party defendants [9]

adjusted variable interest rate tied to the Treasury Bill rate. As of the date of trial, the amount owed had risen to $43,170.00.

5. This proposed repayment schedule was filed with the Court on October 13, 1993. The Court recognizes that interest has continued to accrue on the loans which may alter the numbers proposed at that time.

6. As of the proposed agreement date the Commission indicated that Dr. Barrows owed a total of $28,205.06 in principal and interest.

7. As noted below in the "Remedy/Judgment" section of this Opinion, the debtor in her pleadings does refer in generic terms to possible approval by the Court "as an alternative" of repayment terms with regard to the loans in question should the loans be determined to be nondischargeable.

However, neither in the pleadings nor during the course of the trial did the debtor ever refer to any specific alternative repayment plan or plans.

8. The United States Trustee did not pursue the relief requested in the original motion to dismiss which was subsequently deemed a complaint and withdrew their motion to dismiss on April 8, 1993, Court Doc. No. 38.

9. As to defendants, United States of America, Department of Health and Human Services; James F. Patton, Director, Health Care Administration Sanctions, Department of Health and Human Services individually and in his official capacity; New Hampshire Department of Health and Human Services, Division of Human Services; Harry H. Bird, Commissioner of New Hampshire Department of Health and Human Services individually and in his official capacity;

for discrimination in violation of 11 U.S.C. § 525 by withdrawing the debtor's reimbursement for treatment of Medicaid patients based on the debtor's insolvency;[10] and sanctions against certain third party defendants[11] for violation of the automatic stay. As a result of a Motion to Substitute Party (Court Doc. No. 9), Motion for Voluntary Non–Suit and Dismissal (Court Doc. No. 39) and Motion for Default Judgment (Court Doc. No. 42), all of which were granted by this Court, the above-captioned defendants are the only remaining third party defendants from the original third party complaint in this adversary proceeding.

The Court during the course of the hearings indicated its view that the § 362 and § 525 matters would not support any relief for the debtor inasmuch as the same Congress that enacted those sections deliberately enacted the HEAL loan provisions in separate Title 42 provisions intended to override the Bankruptcy Code provisions, in view of the special nature and policy considerations relating to those educational loans for graduate education to medical and dental professionals. Cf. *Matter of Johnson*, 787 F.2d 1179, 1181 (7th Cir.1986) (section 292f(g) overrides Bankruptcy Code § 1328); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir.1991) (section 292f(g) is "self-executing"). See also *U.S. v. Lee*, 89 B.R. 250, 255–256 (N.D.Ga.1987), *aff'd, In re Hochman*, 853 F.2d 1547 (11th Cir.1988); *In re Green*, 82 B.R. 955, 957 (Bankr.N.D.Ill.1988).

The remainder of this opinion accordingly addresses only the question as to the dischargeability of the debtor's loans.[12] Hearings on these matters were conducted on August 9, 1993, October 22, 1993, and January 25, 1994. After certain post-trial briefing was received the Court took the matter under submission on March 11, 1994.

### FINDINGS OF FACT

At the conclusion of the January 25, 1994 hearing the Court dictated certain findings and fact into the record which are incorporated herein by reference. For informational purposes, the Court will summarize the key factual findings then made as well as additional more detailed findings of fact in the following paragraphs.

At the time of the January 25, 1994 trial, the debtor was a 39 year-old female who financed four years of dental school at Marquette University by virtue of the student loans in dispute. She graduated from school in 1987 and soon thereafter became a licensed and practicing dentist. The debtor is a highly skilled and competent practitioner.

Both the HEAL loans and the GSL loans became due shortly after graduation. With respect to the HEAL loans, the debtor made the following requests for forebearances on the HEAL loans in accordance with 42 U.S.C.S. § 292(c) extensions were granted as follows:

---

Illinois Student Assistance Commission, New Hampshire Board of Dental Examiners, Raymond Jarvis, Executive Secretary, New Hampshire Board of Dental Examiners, individually and in his official capacity.

10. On April 21, 1993 the Court entered an order striking this Count in the amended complaint. [See Court Doc. No. 41].

11. As to Third Party Defendant, New Hampshire Board of Dental Examiners, and Raymond Jarvis, Executive Secretary in his individual and official capacity. On April 19, 1993, the Court granted a motion for voluntary non-suit and dismissal without prejudice as to these defendants.

12. During the course of this case the pertinent federal agencies involved, pursuant to a Congressional mandate, published a list of those profes-

sionals who had not paid their federally guaranteed loans. This list was then picked up by various media and published under headlines such as "Deadbeat Docs Refuse to Pay Loans." The debtor in the present case argued that this too was a violation of the automatic stay and/or prejudiced her rights to a dischargeability determination. This Court disagrees with this contention since it was the Congress that directed the publication in the Federal Register and not the agency itself that determined to take the action that arguably would injure or otherwise frustrate the debtor's conduct of her dental practice. The agency is not responsible for how the media reports a news item. As will be noted later, Congress has plenary power to determine whether bankrupts will be entitled to a discharge of their debts and, if so, all terms and conditions relating thereto. There is no constitutional right to a bankruptcy discharge.

| Date Payment Due | Date Payment to Resume | Reason for Forbearance |
|---|---|---|
| March 1, 1988 | September 1, 1988 | "We do not have the money. My husband is the only one with a steady job." |
| September 1, 1988 | March 1, 1989 | "Do not earn enough money at present time." |
| March 1, 1989 | September 1, 1989 | "Do not earn enough money at present time." |
| September 1, 1989 | March 1, 1990 | "Presently I am not making enough money to pay what is being asked of me." |

The final forbearance request signed September 1, 1989 was denied but the debtor was permitted to reduce the payments to $100 per month for 6 months with regular payments to resume on March 1, 1990. [See Gov't Exhibit No. 113] From October 17, 1989 to November 15, 1990, the debtor made eight payments on her HEAL loans totaling $2,110.35.[13]

Although the GSL loans became due in November 1987, no payments were ever made. There is no authorized forbearance of these loans in the record.

After graduation, the debtor worked in various dental offices before establishing a practice with one other colleague, Dr. Easterly, in Hampton, New Hampshire in April 1991. The debtor started the practice with $20,000 from Dr. Easterly, $20,000 from her aunt and a $125,000 loan from the Hampton Bank. Dr. Easterly left the practice in March 1993. The debtor did experience some financial setbacks resulting from Dr. Easterly's departure. However, the debtor's practice has grown since that time and continues to have potential for expansion if it is well managed.

The debtor is married with no dependents. Her husband is a toll collector whose contribution to annual income is small and not likely to increase. From August of 1987 to August of 1988 the debtor and her husband were earning approximately $55,000. In 1990, their joint income was $48,728; in 1991 it was $20,694 and in 1992 it was $22,255. [Plaintiff's tax returns, Exhibits Nos. 4, 5 and 6] The debtor received a salary from her dental practice of $15,000 in 1991, $16,000 in 1992 and at least $20,000 in 1993. The debtor has entered an agreement with the IRS to use her annual salary over and above $20,000 for the next several years to satisfy payroll taxes due and owing for the fourth quarter of 1991. [See Plaintiff's Exhibit 13, Notice of Federal Tax Lien]

Neither the debtor nor her husband own any realty or have any substantial net worth. The debtor has an aunt who has provided financial assistance over the years, including purchasing the condominium where the debtor and her husband live. On this point, the Court finds the debtor will not be evicted for failure to pay the rent specified, due to her personal relationship with her aunt.

In March 1991, a judgment was obtained on HEAL loans in Wisconsin which forced the federal government, as guarantor of the loans, to pay off the balance in full. There is some evidence that the debtor and her attorney attempted to discuss repayment terms with the collection agency acting for Wisconsin lender of HEAL loans to no avail. As indicated above, the Wisconsin lender had previously agreed to a reduced payment schedule for the six months running from September 1989 to March of 1990. The Wisconsin lender was not particularly interested in working out any further repayment terms, which is not too surprising, given that their alternative to a compromise with the debtor was a 100 percent payout from the federal government as guarantor of the loans. The

13. Payments were made as follows: 10/17/89 ($150.00); 12/05/89 ($250.00); 01/05/90 ($100.00); 02/05/90 ($100.00); 03/22/90 ($200.00); 07/05/90 ($100.00); 09/20/90 ($100.00); 11/15/90 ($100.00); 04/08/92 ($1,010.35). [Exhibit B, Declaration of Eric Houser as part of adversary court doc. no. 21].

Wisconsin lender made this fact clear to the debtor, which effectively put her on notice that the party she should thereafter proceed to negotiate with was the federal government and not the Wisconsin lender.

In September 1991, the debtor received notice that HHS had taken over the loans and was instructed to contact the agency to set up a repayment schedule on the loans or she would be excluded from participation in the Medicare program. The debtor did not respond to this notice and in March 1992, the debtor received a second notice which indicated that her Medicare privilege was revoked. The debtor testified she did not see either notice—possibly because her husband sometimes threw bills away without showing her because he thought they would upset her. Whether or not the debtor actually saw these letters, she was aware the amount was due and nonetheless made minimal effort throughout this entire period to respond to the government's concerns and to work out a repayment plan. I do not find it credible that the debtor had no inkling that the government would be pressing for payment on the outstanding loan and it is disingenuous to suggest that she had no duty to inquire as to what repayment schedule would resolve the matter once the Wisconsin lender was paid under the federal guaranty.

The debtor has had a series of physical problems relating to various illnesses including iritis, episodes of lupus, and back trouble resulting from spina bifida, a birth defect. The debtor has continued to work regardless of these ailments. The debtor has also continued to work notwithstanding numerous financial disasters associated with dental practices where she worked before opening up her own practice. Indeed, this debtor has shown a remarkable resilience in responding to, and overcoming, various physical problems and initial business reverses that might have confounded a person with lesser inner resources and strengths.

In October of 1993 the debtor requested that the record be reopened due to the publication in the local papers in September of 1993 listing the debtor as one of the default-ed borrowers under the HEAL loan program. The debtor testified at the continued hearing that she received numerous phone calls from patients stating they were not going to pay their bills and one threat on her life. She received several calls from the media. The impact of the publication temporarily affected the debtor's dental practice but has not had a lasting effect.

Although the debtor has indicated that she had been hoping to work out a reasonable repayment plan, the record is clear that she has never actively negotiated with any lender regarding payment on her defaulted loans in any meaningful way that could result in a *long-term* realistic repayment plan.

## DISCUSSION OF LAW

 Congress has plenary power to establish laws on the subject of bankruptcies pursuant to Article I, Section 8, of the United States Constitution. It has been held repeatedly that a discharge in bankruptcy is a privilege and not a right. *United States v. Rice,* 182 B.R. 759, 762 (N.D.Ohio 1994); *In re Hampton,* 47 B.R. 47, 50 (Bankr.N.D.Ill. 1985). Congress therefore can condition the discharge of particular debts, for various policy reasons, subject to requirements that may be more restrictive and onerous than discharge provisions with regard to other types of debts. It is in this context that the statutory provisions here in question must be construed.

 There are two types of loans at issue in this case; (1) Loans under the Guaranteed Student Loan Program (GSL loans); and (2) Loans under the Health Education Assistance Loan Program for Graduate Students (HEAL loans). The GSL loans are dischargeable upon a showing by the debtor that failure to discharge the loan would constitute an "undue hardship." 11 U.S.C. § 523(a)(8). To discharge the HEAL Program loans the debtor must show that failure to discharge the loan would be "unconscionable." 42 U.S.C. § 292f(g) (originally enacted as 42 U.S.C. § 294f(g) and recodified at 42 U.S.C. § 292f(g) (West 1993)).[14] Consistent

---

**14.** References in the cases cited herein to "§ 294f(g)" may be read as referring to the pres-

ent § 292f(g) since the language is unchanged.

with the legislative history of the Title 42 provision, courts have invariably found the "unconscionable" standard more difficult to sustain than a finding of "undue hardship." *United States v. Kephart,* 170 B.R. 787, 791 (Bankr.W.D.N.Y.1994) ("the concept of 'undue hardship' is stringent enough but clearly the requirement of unconscionability requires an even greater showing before discharge is appropriate"); *United States v. Rice,* 182 B.R. 759, 760–61 (N.D.Ohio 1994) (standard is "significantly more burdensome" than undue hardship standard); *In re Joyner,* 146 B.R. 232, 234 (Bankr.W.D.Mo.1992) (HEAL loan standard is "more stringent" than 523(a)(8)); *In re Hines,* 63 B.R. 731, 736 (Bankr.D.S.D.1986) (unconscionable under § 292f(g)(2) requires higher standard than a finding of undue hardship). This opinion will address each debt and standard separately.

***Illinois Student Assistance Commission Loan***

■ The debtor seeks to discharge the monies borrowed through the Guaranteed Student Loan program which fall under the "undue hardship" standard of § 523(a)(8). The relevant sections reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

* * * * * *

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will im-

pose an undue hardship of the debtor and the debtor's dependents;

11 U.S.C. § 523(a)(8)(A)(B). The debtor contends that failure to discharge her outstanding loans would impose an "undue hardship." To this end she claims her current income is insufficient to make the payments and her future income is uncertain due to the physical and psychological effects of her ongoing medical ailments, her IRS problems and her family problems. She contends failure to discharge the debt will hinder her "fresh start."

■ Although more lenient than a showing of "unconscionability," "undue hardship" is by no means an easy burden to meet. *In re Mathews,* 166 B.R. 940, 946 (Bankr.D.Kan. 1994); *U.S. v. Lee,* 89 B.R. 250, 254 (Bankr. N.D.Ga.1987) *aff'd, In re Hochman,* 853 F.2d 1547 (11th Cir.1988); *In re Berthiaume,* 138 B.R. 516, 520–521 (Bankr.W.D.Ky.1992). "[A]n undue hardship discharge should only be granted to debtors 'severely disadvantaged economically as a result of unique factors which are so much a part of the bankrupt's life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent, unless by that effort the bankrupt strips himself of all that makes life worth living.'" *In re Courtney,* 79 B.R. 1004, 1010 (Bankr.N.D.Ind.1987) (quoting *In re Kohn,* 5 B.C.D. 419, 424 (Bankr.S.D.N.Y. 1980)). To allow a discharge of the student loans, courts look for a "certainty of hopelessness" in the debtor's personal and financial future. *In re Ballard,* 60 B.R. 673 (Bankr.W.D.Va.1986) (quoting *In re Love,* 33 B.R. 753, 754 (Bankr.E.D.Va.1983)). The inability to pay which can constitute undue hardship must be long-term and not simply a temporary loss of income. *In re Bowen,* 37 B.R. 171 (Bankr.M.D.Fla.1984); *In re Courtney,* 79 B.R. at 1007 (Bankr.N.D.Ind.1987).

■ To make its determination, the Court must look to the individual facts and circumstances surrounding the debtor's financial prospects in the repayment of the student loans. *In re Webb,* 132 B.R. 199, 202 (Bankr.M.D.Fla.1991). Current financial adversity, characteristic of all debtors in bank-

ruptcy court, is not a determinative factor in establishing dischargeability. *In re Wardlow*, 167 B.R. 148, 151–152 (Bankr.W.D.Mo. 1993); *Matter of Springer*, 54 B.R. 910, 913–914 (Bankr.D.Neb.1985). Although the debtor need not live at the poverty line to obtain a discharge, there must be some evidence of attempts to minimize expenses to meet the financial commitment voluntarily made to obtain the benefits of a higher education. *In re Berthiaume*, 138 B.R. at 521; *In re Plotkin*, 164 B.R. 623, 624 (Bankr.W.D.Ark.1994). The Court can take into account the fact that bankruptcy itself in discharging other debts usually makes it easier for the debtor to pay the nondischarged debt. *In re Courtney*, 79 B.R. at 1013. The mere fact that the educational loan in question carries high interest rates and may have increased substantially during the period of nonpayment is not independently a ground for dischargeability. *In re Kephart*, 170 B.R. 787, 792 (W.D.N.Y. 1994); *In re Joyner*, 146 B.R. 232, 234 (Bankr.W.D.Mo.1992).

In general, to determine dischargeability of student loans, the Court is most concerned with the future employability of the debtor. In conducting its analysis, the Court will consider the debtor's present mental and physical problems to the extent that these limitations may affect the debtor's capability to obtain or retain employment. In other words, the financial, physical or mental hardship which may have precluded the debtor's current or past ability to address the debt must continue indefinitely into the future to support a finding of dischargeability. *Matter of Springer*, 54 B.R. 910, 913–914 (if the Court looked only at current financial circumstances of debtors who had financed their education with loans, all student loans would be dischargeable); *In re Courtney*, 79 B.R. at 1015–1016 (debtor had financial wherewithal, as well as future ability and prospects to repay loan).

In addition, not only must the debtor's physical, mental or financial limitations be permanent, they must be severe enough to prevent the obtainment of employment. Review of the case law reveals that the factual circumstances in which a court has allowed a student loan discharge are significantly more distressing than Dr. Barrows' present and future financial position. *Compare In re Bagley*, 4 B.R. 248 (Bankr.D.Ariz.1980) (debtor and husband lived at poverty level and were faced with outrageously high medical bills relating to minor child's respiratory problems); *In re Dresser*, 33 B.R. 63 (Bankr. D.Me.1983) (debtor responsible for supporting two dependent children, was in troubled marriage and was unemployable due to post-traumatic stress disorder resulting from service in Vietnam war); *In re Berthiaume*, 138 B.R. 516 (debtor's permanent health problems precluded her ability to obtain employment in foreseeable future).

Although the Court acknowledges that the physical and professional history of Dr. Barrows has been riddled with formidable obstacles, she has demonstrated unfailing perseverance and stamina in surmounting each barrier before her. Dr. Barrows is a talented and competent professional who owns her own dental practice which, notwithstanding the financial setbacks of the past, clearly has promise as a lucrative and growing business. The evidence before the Court demonstrates that Dr. Barrows unquestionably has the ability to obtain sufficient future income to permit her to properly address the repayment of this debt.

In addition, although the Court in no way belittles the challenges of the debtor's health problems, it also notes her past experiences demonstrate that the ailments are not permanently incapacitating. To the contrary, the debtor is a functioning and productive member of society. This is not to say the debtor will have a perfectly healthy future but only that her history has shown that her illnesses are not so severe that she is permanently unable to work.

In sum, the Court finds that the debtor's difficulties of the past are in no way indicative of her future. Although Dr. Barrows will continue to face the professional challenges associated with owning a dental practice, she has demonstrated an unusual degree of stamina and talent which will serve her well hereafter. The Court believes that Dr. Barrows has the ability to persevere and continue in her profession which has been financed by these loans and without which

she would not have the profession to practice, and believes that she will ultimately be able repay these debts under terms reasonably expectable from the Illinois creditor. The Court accordingly finds that repayment of her debt will not impose an "undue hardship" within the meaning of the statute involved.

### HEAL Program Loans

The Health Education Assistance Loan Program for Graduate Students is a subdivision under the Public Health Service Act. Under the program, the Federal government guarantees loans made by private lending institutions to eligible students pursuing higher education in the medical field. In the event of default of the borrower, the Federal government promises to reimburse the lending institution 100 percent of the outstanding balance of the principal and interest on the debt in exchange for the assignment of the loan. The borrower is then obligated to the Government for repayment.

A loan obtained under the HEAL Program is dischargeable in bankruptcy only if the following three criteria are met:

(g) *Conditions for discharge of debt in bankruptcy.* A debt which is a loan insured under the authority of this subpart may be released by a discharge in bankruptcy under any chapter of title 11, United States Code, only if such discharge is granted—

(1) after the expiration of the seven-year period [15] beginning on the first date, as specified in subparagraphs (B) and (C) of § 292(a)(2) of this title, when repayment of such loan is required;

(2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and

(3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) to the borrower and the discharged debt.

42 U.S.C. § 292f(g) (*recodified* at 42 U.S.C. § 292f(g) (West 1993)). The only question left for decision in the present case is whether the nondischarge of the debt would be unconscionable.

Congress did not specifically define the term "unconscionable" in the statute, and to a certain extent the term is left to the discretion and judgment of the Court. *In re Rice,* 171 B.R. 989, 993–94 (Bankr.N.D.Ohio 1993), *rev'd on other grounds, United States v. Rice,* 182 B.R. 759 (N.D.Ohio 1994). Looking to the common definition of the term, courts have unanimously barred discharge except in the most extreme circumstances. An unconscionable circumstance must be one which is "shockingly unfair, harsh or unjust," "excessive," "unreasonable," or "outrageous." *Matthews v. Pineo,* 19 F.3d 121, 124 (3rd Cir.1994), *cert. denied, Matthews v. U.S., Nat'l. Health Service Corps,* —— U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994); *In re Malloy,* 155 B.R. 940, 945 (E.D.Va.1993), *aff'd* 23 F.3d 402 (4th Cir.1994) (unpublished deposition). Over time, a standard has evolved in which only in the most exceptional case will the Court allow discharge of the debt.

The requirements of § 292f(g) clearly impose more stringent repayment obligations on HEAL borrows than are imposed on other types of student borrowers. This distinction, however, is not surprising in that HEAL borrowers are entering the very lucrative health care profession. In passing § 292f(g), Congress intended to prevent HEAL borrowers from attempting to eliminate sizeable student loan debt, paid from tax dollars, before commencing a highly remunerative profession.

*U.S. v. Lee,* 89 B.R. at 255 (citations omitted).

The factual determination of the "unconscionability" of a particular situation is a function of the totality of the circumstances surrounding the debtor and his or her debt obligation including the debtor's age, health, educational background, employment history, financial condition, earning ability and cur-

---

**15.** The June 10, 1993 amendment of this Act changed the *five* year waiting period to a *seven* year waiting period. In a Memorandum Opinion dated August 9, 1993, this Court held that the *five* year waiting period was controlling in this case. *In re Barrows,* 159 B.R. 86 (Bankr.D.N.H.1993).

rent income. *In re Emnett,* 127 B.R. 599, 603 (Bankr.E.D.Ky.1991); *In re Quinn,* 102 B.R. 865, 867 (Bankr.M.D.Fla.1989). Notably, of the courts which have addressed the unconscionability of requiring full repayment of a HEAL debt, only one has allowed the loans to be discharged. *Kline v. U.S.,* 155 B.R. 762 (Bankr.W.D.Mo.1993). At the Court of Appeal level, the only case involving HEAL dischargeability questions reaching that level has resulted in a determination of nondischargeability. See *In re Malloy,* 155 B.R. 940 (E.D.Va.1993), *aff'd,* 23 F.3d 402 (4th Cir.1994) (unpublished decision affirming "for the reasons stated" in the lower court opinion); Cf. also *Matthews v. Pineo,* 19 F.3d 121 (3rd Cir.1994) (denying discharge under the comparable "unconscionable" requirement for discharge of student loan obligations under the National Health Service Corps Scholarship Program).

The facts and circumstances surrounding the debtor's life in the *Kline* case were particularly appalling and significantly more distressing than Dr. Barrows' personal, career and financial situation. In *Kline,* the debtor obtained $12,818 in loans through the HEAL program to attend chiropractic college. Although she successfully graduated from the program, and at one time held a valid license, she never practiced chiropractic medicine and it was unlikely she ever would. Despite a sporadic and low-paying job history, the debtor attempted to repay her loans until her dire financial condition compelled her to enter forbearance agreements for a year before filing for bankruptcy. The debtor's future job prospects were bleak.

In addition to the debtor's financial problems, she had a history of physical and emotional abuse from her family, her former husband and former employers. She suffered from chronic mental and emotional problems resulting from "a litany of personal tragedies and traumas which are remarkable in number and severity." In analyzing the debtor's past circumstances and future potential, the Court stated:

> Debtor is without doubt one of the unhappiest persons with one of the most desolate views of the world and its relation to her that one could ever encounter.

> \* \* \* \* \* \*

> The court has no doubt that Debtor suffers from severe, chronic depression and anxiety and panic disorders, and the court has no expectation that Debtor's condition will improve to any significant degree.... the court concludes that debtor's emotional outlook is extraordinarily bleak and that her chronic emotional state does not give any indication of improvement in the foreseeable future. The court further finds that such conditions have rendered Debtor unable for all practical purposes to be normal, functioning person in society; that Debtor is unable to maintain meaningful employment for more than a short period of time; and that Debtor is unable to earn sufficient income to support herself and her child and repay HEAL loans.

*Kline,* 155 B.R. at 765.

The Court finds Dr. Barrows' situation is also less onerous than that of the debtor in the recent *Malloy* case cited above, in which discharge was denied. In that case, the debtor accumulated over $30,000 in HEAL loans before ultimately dropping out of medical school and abandoning hopes of a future in medicine. Although acknowledging that the debtor was certainly not exhibiting a prosperous lifestyle at the time of bankruptcy, the Court still found that the nondischarge of the loans would not be "unconscionable." In analyzing the debtor's situation, the District Court, in reversing the Bankruptcy Court's granting of discharge, stated:

> Malloy is arguably now underemployed, and given his college degree, it is not unreasonable to assume that, with effort, his income could increase in the coming years. Under these circumstances, while Malloy's situation is unfortunate, it is not unconscionable, i.e., 'shockingly unfair or unjust' or 'outside the limits of reasonableness or acceptability,' to deny his request for discharge of his entire HEAL debt.

*In re Malloy,* 155 B.R. at 947.

The decision by the Third Circuit in *Matthews v. Pineo, supra,* is also instructive. In that case the debtor refused to fulfill her

commitment to practice for a period of years in an area lacking physicians, which was a condition of her getting an NHSC Scholarship grant. That program provided for liquidated damages, in terms of the monies advanced with interest, in the event that the borrower defaulted on the obligation to provide the requested services. A separate provision of Title 42 provided, as is true with regard to HEAL loans, that obligations resulting from such default would be nondischargeable in bankruptcy unless determined to be unconscionable.

In reversing both lower courts, which had approved dischargeability, the Court in *Matthews* noted:

Applying this definition, we hold that nondischarge of Dr. Matthew's entire debt would not be 'unconscionable.' First, we find it significant that the NHSC has presented Dr. Matthews with the option of fulfilling her service obligation even at this late date. As noted, the bankruptcy court felt that it would be 'outside the limits of what is reasonable' to require Dr. Matthews to 'close her practice, leave her home and the building in which she practices, possibly separate herself from her husband, and uproot her children's lives for temporary relocation to a NHSC high priority area.' *Matthews*, Ch. 7 Case No. 90–00765E, Adv. No. 90–0133, op. at 2–3 [150 B.R. 11, 14]. This reasoning, however, appears to misapprehend the extremely limited scope of the concept of unconscionability. An option is not 'unconscionable' simply because it may be disruptive, unpleasant, undesirable, or painful. Instead, to be 'unconscionable' an option must be 'shockingly unfair, harsh or unjust' or 'outrageous,' and the facts cited by the bankruptcy court and by Dr. Matthews do not show that a temporary relocation to satisfy her service obligation would rise to this level. These facts show little more than that Dr. Matthews and her family would experience some of the ordinary difficulties of relocation, and we do not believe that the ordinary difficulties of relocation can be regarded as 'unconscionable.'

\* \* \* \* \* \*

The test for unconscionability is not whether repayment of an NHSC obligation would prevent the debtor from maintaining the standard of living of the average physician or the standard of living to which the debtor is accustomed. Average taxpayers subsidize the medical education of NHSC scholarship recipients. Requiring such recipients who flout their service commitments to live like average taxpayers is not 'unconscionable.'

*In re Matthews,* 19 F.3d 121 at 124, 125.

For the reasons enumerated in the prior discussion, the Court is confident that Dr. Barrows' financial situation is currently stable and will continue to improve in the coming years, and that repayment of the HEAL loan under the terms reasonably expectable from the Government can be accomplished without imposing a burden that is outrageous or otherwise excessive. The Court accordingly finds that repayment of her debt is not "unconscionable" within the meaning of the statute involved.

### *REMEDY/JUDGMENT*

In her original complaint and succeeding memorandums the debtor has included in her pleadings an alternative request for relief, in terms of a "partial discharge" should the Court find that only some portion of the debt should be deemed nondischargeable. The debtor has also requested in an alternative fashion that if the Court does not determine the debt completely dischargeable, and does not grant a partial discharge, it should "either set up a repayment plan or supervise the judgment." [Debtor's Response Memorandum, Court Doc. No. 72]. The defendant creditors for their part have sought only a determination of dischargeability or nondischargeability of their debts and have not sought the entry of a money judgment by this Court.

 With regard to the first contention by the debtor, a sufficient answer is that the Court has not determined that repayment of any portion of the educational loans in question would be either undue hardship

or unconscionable. Moreover, while there is some conflicting case law, as cited by the debtor, I believe the better view is that Congress in the statutory provisions in question has given the bankruptcy court only power to determine dischargeability or nondischargeability per se, applying the pertinent statutory standard to the record before it, and not any power to grant partial discharges. *United States v. Rice,* 182 B.R. 759 (N.D.Ohio 1994); *In re Courtney,* 79 B.R. 1004, 1013 (Bankr.N.D.Ind.1987). Whatever equitable jurisdiction this Court might arguably have under § 105(a) of the Bankruptcy Code to issue such a judgment, in the absence of any statutory enabling language in that regard, should not in my view be exercised in a case in which the debtor has filed a straight bankruptcy proceeding under chapter 7 and in which the debtor has not exhibited a good faith effort to come up with meaningful counter-proposals to repayment plans tendered by the creditors.

■■■ With regard to the question of approving a specific repayment plan and/or retaining jurisdiction to supervise the judgment, the Court concludes again that such relief is not warranted once a determination of nondischargeability of educational loans is reached. *In re Wardlow,* 167 B.R. 148, 152–153 (Bankr.W.D.Mo.1993); *In re Bowen,* 37 B.R. 171, 173 (Bankr.M.D.Fla.1984).

I am aware in reviewing the case law under both 11 U.S.C. § 523(a)(8) and 42 U.S.C. § 292f(g) that a number of courts have in effect granted partial discharges under these statutory standards, have approved various repayment plans, and, on occasion, have even retained jurisdiction to supervise such repayments. I believe however that such courts have given insufficient weight to the strong policies underlying the congressional legislation with regard to educational loans, i.e., to restrict their discharge in bankruptcy within narrow limits to facilitate their collectability by appropriate enforcement ac-

tions. Such courts furthermore have not noted that in chapter 7 cases, unlike chapter 11 and chapter 13 repayment cases, the debtor's future income following the bankruptcy filing is not subject to the jurisdiction of the Court as property of the estate.[16] To allow a chapter 7 debtor to in effect have a "repayment plan case" in a chapter 7 proceeding is simply inappropriate in terms of the statutory options provided by Congress for debtor relief.

With regard to the question of remedies and form of judgment, I conclude that once a nondischargeability determination is made with regard to educational loans, in a chapter 7 case in which the debtor's future income is not property of the estate, the entry of any money judgment and any repayment terms should be left to the affected parties in the first instance, and, if enforcement is required in an appropriate court action, should be left to a court of competent jurisdiction as would have occurred had there been no bankruptcy. I am confident in the present case that these lenders will give the debtor an opportunity to pay the nondischargeable debts in reasonable installments. *Cf. In re Emnett,* 127 B.R. 599, 604 (Bankr.E.D.Ky.1991). The civil courts, both federal and state, have power to provide for payment of judgments by installments in appropriate cases. The determination of nondischargeability by this Court will permit that process to go forward.

### CONCLUSION

The Court concludes that both the GSL and the HEAL loan obligations here in question are nondischargeable under applicable law. Each creditor involved may pursue collection of the nondischargeable debt, in the appropriate state or federal court as they may be advised, unaffected by this bankruptcy proceeding.

A Final Judgment in conformity with this Opinion shall be entered separately.

---

16. Bankruptcy Code §§ 541(a)(1), 1141, and 1306. See also *In re Courtney,* 79 B.R. at 1013.

## ANNEX A

Summary of loans from Health Education Assistance Loan Program: