**In re Lonnie A. COTHRAN and Jenell L. Cothran, Debtors.**

**Lonnie A. COTHRAN, Plaintiff,**

v.

**UNITED STATES PUBLIC HEALTH SERVICES/HEALTH RESOURCES & SERVICES ADMINISTRATION, et al., Defendant.**

**Bankruptcy No. 97–72685.**
**Adversary No. 98–7014.**

United States Bankruptcy Court,
E.D. Oklahoma.

Oct. 26, 1998.

Bill R. Perceful, Pocola, OK, for Plaintiff.

Cheryl R. Triplett, Assistant United States Attorney, Muskogee, OK, for Defendant.

## OPINION

TOM R. CORNISH, Bankruptcy Judge.

Lonnie A. Cothran ("Debtor") seeks to discharge Health Education Assistance Loans ("HEAL loans") in this Chapter 7 bankruptcy proceeding. The issue is whether the discharge of these loans will be unconscionable. The Debtor asserted a constitutional argument which was set forth in the Pre-Trial Order; however, that issue was abandoned at trial. The Court hereby enters its findings and conclusions pursuant to Rule 7052, Fed.R.Bankr.P.

### JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).

### FINDINGS OF FACT

1. The Debtor is a licensed chiropractor. He obtained these loans while attending Texas Chiropractic School. He graduated from chiropractic school in April 1987. Prior to that time, he attended Oklahoma State College in Willburton and Southwestern Oklahoma State University in Weatherford. He obtained a degree in pharmacy in 1973. He did not like the pharmacy profession and during that time, he decided to go to chiropractic school. Currently, the Debtor does not have a pharmacy license and stated he did not have what it would take to be reinstated to his pharmacy license.

2. The Debtor opened his own office in Poteau, Oklahoma. Thereafter, he opened an office in Stigler, Oklahoma and one in McAlester, Oklahoma. The offices in McAlester and Stigler were closed in September, 1990. Presently, the Debtor's only office is in Poteau and has the following hours: Monday, Wednesday and Thursday from 8:00 a.m.—12:30 p.m. and 2:30 p.m.—5:00 p.m.; Tuesday and Friday from 8:00 a.m. to 1:00 p.m. Mrs. Cothran works at the clinic. She acts as Dr. Cothran's assistant. She takes patients to the therapy room and guides the patient through the office visit. Dr. Coth-

ran's only other employee is a secretary who works 32 hours per week.

3. The Debtor lives in Shady Point, Oklahoma. He resides there with his wife and their two daughters. The Debtor is 50 years of age and his wife is 43 years old. The daughters are 13 and 11 years old.

4. In 1990, the Debtors purchased a mobile home and 10 acres from Leon Barbee. The Debtors moved into the mobile home as their principal residence. The mortgage on this property was $21,000 payable in monthly payments of $252.04. On March 20, 1991, a second real estate mortgage was executed for $32,550 payable in monthly installments of $390.65. At that time, the Debtors purchased a piece of property adjacent to theirs which also had a mobile home located on it. Mrs. Cothran's sister was going through a divorce and moved into this second mobile home. This mobile home was sold in 1995. The Debtors incurred a loss on this sale. In 1997, the Debtors borrowed at three different times, a total of $65,000 from Guine Williamson and gave him three mortgages on the property. The monthly payment on these mortgages is $858.98. During this time, the Debtors were building a 4,000 square foot home on the original property.

The Debtors began building the home in 1994 and in 1997, borrowed the money to finish the home from Mr. Williamson. At the time the Debtors borrowed the money the concrete slab, framing, roof and plumbing rough in had been completed. The Debtors borrowed the money because their money and effort in the portion of the house that had been completed was being lost by the weather. The Debtors moved into the home in November 1997. Mrs. Cothran testified they are actually living in 2,000 square feet of the home and the other 2,000 square feet were intended for use as Dr. Cothran's clinic. She further testified that none of the trim work is finished, the painting has not been done, the walls are not finished in some places and there is no porch. The Court notes that the Debtors did not present any pictures of this home.

On April 3, 1998 Barbee released his mortgage on the Debtors' home. Barbee took the mobile home, which had been previously used by the Debtors, sold it and forgave the balance of the debt owed to him. This amounted to approximately $15,000.

5. The Debtors list, on Schedule D, a debt to Poteau State Bank in the amount of $2,972.00. The debt is secured by a 1984 Toyota truck and 1992 Ford minivan. That debt has been paid since the filing of this bankruptcy.

6. Dr. Cothran testified that he has health problems which do not enable him to work full-time. He has suffered from cardiac arrhythmia since he was 21 years old. This arrhythmia causes shortness of breath, chest pains, fatigue and lightheadedness. Overexertion, stress and eating too much can exacerbate the condition. However, the Debtor admitted on cross-examination that despite his arrhythmia, he had obtained two degrees and built a house.

The Debtor was diagnosed with lymphoma in 1981. He had chemotherapy for six months and radiation for seven weeks. At the present time, the Debtor is cancer free. The Debtor submitted medical records which reflect on June 3, 1993, the Debtor had a normal electrocardiogram. Further on June 24, 1993, the Debtor's echocardiogram was normal. The Debtor has been taking medication for this condition. There were no notations, in his medical records, which would prohibit the Debtor from working. Further, the Debtor testified that he suffers from irritable bowel syndrome; however, he does not take any medication for his condition. The Debtor also suffers from redness of the eyes and low thyroid. He uses eye drops for the redness of his eyes. The Debtor's medication cost is approximately $275 per month. However, Dr. Cothran believes this amount is grossly understated.

7. The Debtors' oldest daughter currently wears braces which cost $58 per month. The youngest daughter will begin orthodontic treatment next month. This requires a down payment of $350 and $58 per month until the braces are removed.

8. On Debtors' Schedule J, they list home mortgage payment of $1,250.00; however, this amount included the payment to Mr. Barbee and that debt has been satisfied.

Further, the Debtors include a $460 per month payment for health insurance. Dr. Cothran testified that the health insurance was canceled in March, 1998. An expense for child care was also listed in the amount of $433.00. However, Mrs. Cothran testified that they no longer incur that expense. There is an expense, on Schedule J, for installment payment for "Auto" in the amount of $371.00. However, Dr. Cothran admitted that this debt had been paid as of the date of the hearing. The Debtor's total expenses including the items which are no longer paid are $4,962.00. The Debtors' income as reflected on Schedule I is $1,552.00. The Debtors listed expenses totaling $1,264 which they are not paying at this time.

9. Dr. Cothran testified that his business income has decreased over the last three years. However, when looking at his tax returns just the opposite is true. In 1995, his business income was $18,811. In 1996, the business income was $20,043 and in 1997, the business income was $21,126. The Debtor testified that he writes off approximately two-thirds of his accounts receivable as uncollectible.

10. The Debtor testified that insurance companies are cutting back the amount which is allowable for chiropractors. Medicare only allows a charge of $19 for a $40 visit. Workers' compensation only allows 18 visits for an injury and in previous years 45 visits were allowed for an injury.

11. In 1996, the Debtors received Form 1099–R for IRS distributions in the amount of $423.60 and $718.09.

12. Student Loan Marketing Association obtained a judgment in Case No. C–90–83 in LeFlore County, State of Oklahoma in the amount of $57,695.17. That judgment was assigned to the United States. The Debtor has discharged $23,988.44 in student loans, other than these HEAL loans, because the repayment period began more than seven years ago. The Debtor's repayment history on the HEAL loans has been sporadic and would be considered "poor."

## CONCLUSIONS OF LAW

A. The Debtor seeks to discharge these HEAL loans. A discharge in bankruptcy is a privilege not a right. *Barrows v. Illinois Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 647 (Bankr.D.N.H. 1994). "Congress therefore can condition the discharge of particular debts, for various policy reasons, subject to requirements that may be more restrictive and onerous than discharge provisions with regard to other types of debts." *Id.*

B. A HEAL loan is not dischargeable unless: (1) seven years have passed from the time repayment began; (2) not discharging the loan would be unconscionable; and (3) t he Secretary has waived certain rights. 42 U.S.C. § 292(g). The parties stipulated that seven years have passed since repayment began and the Secretary has not waived certain rights. As a result, the issue is whether not discharging the debt would be "unconscionable."

C. "Unconscionable" is not defined in the statute. *Id.* at 650. However, courts have interpreted the standard to be " 'shockingly unfair, harsh or unjust,' 'excessive,' 'unreasonable,' or 'outrageous.' " *Id.* (citations omitted). Courts look at the following factors: (1) income, (2) earning ability, (3) health, (4) educational background, (5) dependents, (6) age, (7) accumulated wealth and (8) professional degree. *Emnett v. United States (In re Emnett)*, 127 B.R. 599, 603 (Bankr.E.D.Ky.1991).

D. "Unconscionability" requires a greater showing than "undue hardship under 11 U.S.C. § 523(a)(8)." *Barrows* at 648 (citations omitted); *Rice v. United States (In re Rice)*, 171 B.R. 989, 993 (Bankr.N.D.Ohio 1993), *aff'd in part rev'd in part*, 182 B.R. 759 (N.D.Ohio 1994). In *Rice*, the court found that the debtors did not even meet the "undue hardship" requirement and therefore, would not be able to discharge the HEAL loan.

E. This Court in determining whether a debtor should be allowed to discharge a student loan because of an "undue hardship," begins its inquiry with the poverty guidelines. The 1997 poverty guidelines for a family of four is $16,050. The Debtors income is more than the poverty guideline.

The Debtor has the ability to earn income with his chiropractic degree or if he would, he could return to the pharmacy profession. Although he has had some health problems in the past, the only hindrance, if any, is his cardiac arrhythmia. The Court finds it hard to believe that the Debtor cannot work an eight hour day but can earn two degrees and build a house with his problem. The Debtor only has three dependents and is only 50 years old. Although the Debtor does not have any accumulated wealth, he used earnings to build his home instead of paying his HEAL loans. Further, during the time the Debtor should have been repaying these loans, he borrowed $65,000 to build a 4,000 square foot home. The Debtors only have a mortgage for 10 years, when it is not unusual for a term of a mortgage to be 30 years. The Court realizes that the Debtors need a place to live, but they do not necessarily need a 4,000 square foot home. The Debtor has already been relieved of $23,988.44 in student loans which have been discharged.

■ The Court finds that the Debtor benefitted from these student loans and in a total disregard for repayment has been incurring additional debt. The Court does not believe the Debtor ever had a good faith intention to repay these loans. The payment history was, at most, sporadic. As a result, the Debtor should not be allowed to discharge the HEAL loans.

■ F. The Court is not allowed to reduce the amount of the nondischargeable debt. The court in *United States v. Rice*, 182 B.R. 759, 762 (N.D.Ohio 1994), *aff'd* 78 F.3d 1144 (6th Cir.1996), found that the reduction of the amount determined to be nondischargeable for a HEAL loan was "in contravention of the controlling statutory provision and is not supported by the record in this case." Congress "enacted the HEAL loan provisions in separate Title 42 provisions intend[ing] to override the Bankruptcy Code provisions, in view of the special nature and policy considerations relating to those educational loans for graduate education to medical and dental professionals." *Barrows* at 645. The court in *Barrows* noted that the bankruptcy court was only given the power to determine whether the HEAL loan was dischargeable and had no authority to grant a partial discharge. *Id.* This Court agrees and will not grant a partial discharge.

IT IS THEREFORE ORDERED that HEAL loans are **nondischargeable.** A separate judgment will be entered in accordance with this opinion.