PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

U.S. DEPARTMENT OF HEALTH &
HUMAN SERVICES,
                    *Plaintiff-Appellant,*

            and

GREAT LAKES HIGHER EDUCATION
SERVICING CORPORATION, Agent for
Associated Bank,
                    *Plaintiff,*

            v.

ZANE TODD SMITLEY,
                    *Defendant-Appellee.*

No. 02-2056

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-01-550-5, S-00-00097-5-AP)

Argued: June 5, 2003

Decided: October 20, 2003

Before MICHAEL, MOTZ, and KING, Circuit Judges.

_____

Reversed by published opinion. Judge Motz wrote the majority opinion, in which Judge King joined. Judge Michael wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Anne Margaret Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellant. Douglas Quinn Wickham,

HATCH, LITTLE, BUNN, L.L.P., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Frank D. Whitney, United States Attorney, Neal I. Fowler, Assistant United States Attorney, Raleigh, North Carolina, for Appellant.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

In this Chapter 7 case, the United States Department of Health and Human Services (HHS) appeals the district court order affirming the bankruptcy court's discharge of the Health Education Assistance Loans ("HEAL loans") of Zane Todd Smitley. Because the district court erred in holding that nondischarge of the HEAL loans would be unconscionable, as is required by 42 U.S.C.A. § 292f(g) (West 2003), we reverse.

I.

From 1983 through 1985, Smitley obtained approximately $27,000 in HEAL loans in order to attend the Cleveland Chiropractic College. After Smitley graduated in September 1985, the holder of the loans, Student Loan Marketing Association (SLMA), provided Smitley a repayment schedule, with payments to start in September 1986. From August 1986 through May 1988, Smitley requested and received four forbearances; he made no payments during those times. After the forbearances, Smitley failed to keep his HEAL loan payments current.

Smitley's default resulted in assignment of the loans to HHS. In November 1991, HHS notified Smitley of the assignment, and the parties entered into a Repayment Agreement. At that time, the total debt amount equaled approximately $42,000. From March 1992 through August 1999, Smitley made monthly payments of $100, totaling $7,600. Despite his promise in the Repayment Agreement to "increase [his] monthly payment with the month following any increase in income," Smitley did not increase the monthly payments, even though his income substantially increased over those years (to more than $80,000 in one year).

On October 26, 1999, Smitley and his wife filed a Chapter 7 petition in the bankruptcy court. On February 11, 2000, they received a general discharge of over $100,000. On February 7, 2000, Smitley filed the instant adversary proceeding against HHS, the Educational Credit Management Corporation (ECMC), and the Great Lakes Higher Education Corporation.[1] Smitley sought discharge of approximately $63,000 of principal and interest in HEAL loans and an additional $68,000 in principal and interest in educational loans owed to ECMC.[2]

On April 12, 2001, the bankruptcy court held a trial on the adversary proceeding. The parties agree that the facts of this case are undisputed. At the time of trial, Smitley was 47 years old, in good health, and lived in Raleigh, North Carolina. He had received an undergraduate degree in secondary education and worked as a secondary school teacher prior to seeking his chiropractic degree. After chiropractic school, Smitley purchased a practice from another chiropractor and practiced for approximately 13 years. During that time, Smitley had a fire in his office, suffered an injury that kept him out of work for six weeks, and incurred medical bills of $22,000, which Mrs. Smitley testified had been paid off at the time of trial. In 1999, he closed his chiropractic practice because of financial difficulties.

Since closing the practice, Smitley has worked part-time as a carpenter. Smitley now works 30-38 hours per week as a finish trim carpenter, earning $15 per hour. He testified that he had not "explored the possible hours [he] could get from another finish carpenter" job.

Both his chiropractic and secondary education licenses had lapsed at the time of trial. Smitley has made a few attempts to obtain part-time or evening jobs at retailers and grocery stores. He also applied for a few teaching jobs at the university level and testified that people at his church had looked for management jobs for him. But Smitley did not seek teaching positions at the high school level, positions as a factory foreman (for which he had prior experience), positions in

---

[1]The Great Lakes Higher Education Corporation did not participate in the adversary proceeding because ECMC is its successor in interest.

[2]The record indicates that Smitley paid approximately $10,000 toward his ECMC loans.

other geographic areas (except for a teaching position at a college in Ohio), or employment counseling of any kind.

At the time of the trial, Smitley's wife was 45 years old. Mrs. Smitley works about 30-35 hours per week, for $12-$13 per hour, as an assistant to two dentists. She testified that she cannot work additional hours because of undiagnosed problems with her hands.

In April 2001, the Smitleys had four children under the age of eighteen: 17-year-old twins and two other children ages 14 and 8. The children have health insurance through the State, but Smitley and his wife do not have health insurance.

From 1995 through 2000, the Smitleys reported the following annual income to the Internal Revenue Service: $83,064 (1995), $58,053 (1996), $63,691 (1997), $58,354 (1998), $40,675 (1999), and (approximately) $42,000 (2000). The Smitleys made substantial donations to their church during some of those years — $5,800 in 1995, $4,700 in 1996, and $3,000 in 1997. The family rents a two-story, three-bedroom house for $1,250 per month in Raleigh, North Carolina. Mrs. Smitley has a retirement account of approximately $10,000, consisting of her employer's contributions. The family owns two automobiles, on one of which, a van, they owe a monthly payment of $434 per month.[3] Members of the family's church occasionally donate money and other items to them. The Smitleys often pay bills a month behind, and owe about $14,000 in back federal and state taxes; the IRS has set-up a payment plan of $100 per month on the federal taxes.

Smitley stated the following basis for his "belief that the debt to the United States should be discharged based on unconscionability":

> We are both working 33 to 38 hours a week, continuing to pursue our jobs to be able to support ourselves and our family. We are both employed, have good jobs. We are unable to pay our regular bills. Our children must earn their own

---

[3]At the time of the trial, one of the vehicles needed repair work that would be delayed until the Smitleys had paid a $500 bill from their mechanic.

> money to do activities. Our teenage daughters are unable to get a driver's license because we cannot afford insurance. [We] cannot afford health insurance, and it is not offered by our employers. Therefore, we must pay all of our own medical bills. We have no way at this time to pay all of our bills, save for the future, or make plans for our children's futures.

Smitley testified that he had not made any efforts since the bankruptcy filing to consolidate his loans in order to reduce the monthly payments.

On April 13, 2001, the bankruptcy court issued an order, finding that Smitley "is probably underemployed as a carpenter, but he has no prospects for other employment." It stated that "[i]t is apparent to the court that Mr. Smitley cannot possibly repay his educational loans that total more than $170,000 [sic]."[4] The court noted that inability to pay is not the test for dischargeability; rather it recognized that the test for the HEAL loans is "unconscionability" under § 292f(g) and that the test for the ECMC loans is "undue hardship" under 11 U.S.C.A. § 523(a)(8) (West 1993 & Supp. 2003). The court held that, "although the debtor is unable to pay the full amount of the loans, he may be able to pay a part of the loans." Because Smitley had not availed himself of the lenders' programs for financially disadvantaged borrowers, the court concluded that it could not determine whether the debts should be discharged. It ordered Smitley to apply to the lenders for consideration under these programs and report back to the court.

After Smitley reported back that (based on a total loan amount of $135,000, an annual gross income of $42,000 and four dependents), the minimum payment under the lenders' programs would be $327.67 per month, the bankruptcy court ordered both the $63,000 in HEAL loans and the $68,000 in ECMC loans discharged. Assuming an interest rate of 8.19%, the court believed that interest would accrue on both loans at $11,000 per year and the minimum payment would

---

[4]Actually, the total loan debt (both the HEAL and ECMC loans) equaled approximately *$131,000*; it appears that the $170,000 figure was a typographical error, although it could have influenced the bankruptcy judge's decision.

amount to just under $4,000 per year ($327.67 x 12). The bankruptcy court recognized the differing standards governing discharge of the HEAL and non-HEAL loans, but concluded that it would be "unconscionable" to refuse to discharge both loans. The court reasoned:

> Even if Mr. Smitley were to make the payments according to the repayment schedule submitted, not only would he never fully repay the loan, but he would also never reduce the principal due. Instead, the amount would continue to increase. The prospects for Mr. Smitley to make higher payments in the future are not good, and if the balance continues to increase, the chances of his ever repaying the loans are nil. In the context of the bankruptcy proceeding, the court finds that requiring the debtor to continue to pay this debt for the rest of his life, with no hope of a final payment, is unconscionable. The HEAL loan, therefore, shall be discharged. . . . [and] Mr. Smitley's loans from Educational Credit shall also be discharged.

The district court affirmed the bankruptcy court's discharge order, holding that "[b]ased on the reasoning of the Bankruptcy Court, and this Court's evaluation of Debtor's dire financial situation, this Court finds that nondischarge of Smitley's outstanding student loans would be unconscionable in this case." It held that Smitley had met both the undue hardship and the unconscionability standards.

This appeal involves only discharge of the HEAL loans; ECMC did not appeal the discharge of its loans.

## II.

The sole question before us is whether the nondischarge of Smitley's HEAL loans would be "unconscionable" under § 292f(g)(2).[5]

---

[5]In addition to the unconscionablity requirement, § 292f(g) also requires that a discharge be granted only after the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended *and* upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt. *See* § 292f(g)(1), (3). The parties do not dispute that these requirements have been satisfied.

We begin with the standard of review. The determination of the meaning of "unconscionable" constitutes a question of law reviewed *de novo*. *See, e.g.*, *In re Ekenasi*, 325 F.3d 541, 544 (4th Cir. 2003) ("We review the bankruptcy court's . . . legal conclusions *de novo*.") (citing *In re Kielisch*, 258 F.3d 315, 319 (4th Cir. 2001)).

In addition, both parties assert, and we agree, that application of the unconscionability standard to the facts of this case constitutes a mixed question of law and fact, requiring "a conclusion regarding the legal effect of the Bankruptcy Court's findings as to [the debtor's] circumstances." *In re Long*, 322 F.3d 549, 553 (8th Cir. 2003) (holding question of "undue hardship" for discharge of educational loans reviewed *de novo*). We review mixed questions of law and fact "under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts." *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996) (citation omitted); *see also In re Hornsby*, 144 F.3d 433, 436 (6th Cir. 1998) (applying clearly erroneous standard of review to factual findings underlying "undue hardship" determination, which court reviews *de novo*); Fed. R. Bankr. P. 8013 (West 1984 & Supp. 2003) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

We note that this approach accords with that of the only circuit to have passed on the question in connection with HEAL loans, as well as all of the circuits to have considered the lesser "undue hardship" standard for other educational loans under § 523(a)(8)(B). *See In re Rice*, 78 F.3d 1144, 1148 (6th Cir. 1996) (holding that question of whether nondischarge of a HEAL loan is unconscionable reviewed *de novo* (citation omitted)); *see also In re Long*, 322 F.3d at 553 (collecting cases and joining Second, Third, Sixth, Seventh, Ninth, and Tenth circuits in holding that question of whether nondischarge of a loan constitutes an "undue hardship" under § 523(a)(8)(B) is reviewed *de novo*).

In the case at hand, the parties agree that the facts are undisputed. Thus, our task involves *de novo* consideration of two legal questions:

the meaning of "unconscionable" under § 292f(g) and the application of that standard to the discharge of Smitley's HEAL loans.

III.

A.

Congress has not defined "unconscionable" as used in § 292f(g), and we have not addressed the question in a published opinion. The Supreme Court has directed, however, that "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (internal quotation marks and citation omitted)).

The dictionary defines "unconscionable" as "excessive;" "exorbitant;" "lying outside the limits of what is reasonable or acceptable;" "shockingly unfair, harsh, or unjust;" or "outrageous." Webster's Third New International Dictionary 2486 (1993); *see also Matthews v. Pineo*, 19 F.3d 121, 124 (3d Cir. 1994) (so construing term "unconscionable" as used in 42 U.S.C.A. § 254*o*(d)(3)(A), which establishes conditions for discharge in bankruptcy of National Health Service Corps scholarship obligations). In light of the common meaning of unconscionable, we agree with the Sixth Circuit (the only circuit to have previously construed the term in § 292f(g)), that there is "little doubt that in using this term [Congress] intended to severely restrict the circumstances under which a HEAL loan could be discharged in bankruptcy." *Rice*, 78 F.3d at 1148.

The unconscionability standard is stringent, demanding more than the "undue hardship" standard for the discharge of educational loans under § 523(a)(8)(B) (the standard applicable to the ECMC loans in this case). *See id.* at 1149 (citing, *inter alia*, *Malloy*, 155 B.R. 940, 945 (E.D. Va. 1993), *aff'd*, 23 F.3d 402 (4th Cir. 1994) (unpublished)); *see also In re Wood*, 925 F.2d 1580, 1583 (7th Cir. 1991) (noting that unconscionability is a "higher standard" than undue hardship). Moreover, the debtor bears the burden of proving unconscionability, and "[g]iven the strict nature of the unconscionability standard, this burden is a heavy one." *Rice*, 78 F.3d at 1149 (citation omitted).

In determining whether nondischarge of a HEAL loan meets this stringent standard, a court must focus on the "totality of the facts and circumstances surrounding the debtor and the obligation." *Id.*; *see Malloy*, 155 B.R. at 945; *In re Barrows*, 182 B.R. 640, 650-51 (Bankr. D.N.H. 1994); *In re Emnett*, 127 B.R. 599, 602 (Bankr. E.D. Ky. 1991). The relevant objective factors include "the debtor's income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree." *Rice*, 78 F.3d at 1149 (citing *Barrows*, 182 B.R. at 650; *Malloy*, 155 B.R. at 945; *In re Quinn*, 102 B.R. 865, 867 (Bankr. M.D. Fla. 1989)). A court should also examine the debtor's standard of living, "with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *Rice*, 78 F.3d at 1149 (citation omitted); *Ekenasi*, 325 F.3d at 546 (under "undue hardship" test, debtor must show, *inter alia*, "that he cannot maintain a minimal standard of living for himself and his dependents, based upon his current income and expenses, if he is required to repay the student loans") (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) (per curiam)).

A court should determine if "the debtor's current situation is likely to continue or improve," including "whether the debtor has attempted to maximize his income by seeking or obtaining stable employment commensurate with his educational background and abilities" and whether he could supplement his income through secondary part-time or seasonal work, "[e]ven if the debtor is already employed full-time." *Rice*, 78 F.3d at 1149-50 (citing, *inter alia*, *Matthews*, 19 F.3d at 124 ("[t]he proper inquiry is whether it would be 'unconscionable' to require [the debtor] to take any available steps to earn more income")); *see also In re Zierden-Landmesser*, 214 B.R. 300, 304 (Bankr. M.D. Pa. 1997) (concluding that it was not unconscionable to require debtor to earn more income by relocating business or leaving medical "profession entirely to seek alternative employment"). A court should also consider whether any dependents of the debtor "are, or could be, contributing financially to their own support." *Rice*, 78 F.3d at 1150.

Finally, the amount of the debt and the rate of interest are relevant. *Id.* at 1149. But when weighing these factors, a court must also consider the debtor's role in accruing the amount of debt, including

requesting multiple forbearances and making minimal repayments. *See, e.g*, *Rice*, 78 F.3d at 1150-51 ("[T]he current substantial amount of the debt was largely Rice's own doing. His minimal repayments, some made involuntarily, reflect little effort to satisfy the original $20,000 obligation. This factor weighs particularly strongly against discharge in this case. . . ."); *Malloy*, 155 B.R. at 948 ("[M]uch of the accrued interest on Malloy's debt is attributable to his own conduct in requesting forbearance and in failing to seek discharge in bankruptcy at an earlier date."); *see also United States v. Kephart*, 170 B.R. 787, 792 (Bankr. W.D.N.Y. 1994) (holding, in § 254*o* case, that "[i]t would be perverse to allow the debtor to benefit from her own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one. This, of course, would benefit those who delay and obstruct the longest and could encourage other students to follow the course taken by" the debtor). In this regard, the court "should examine the debtor's previous efforts to repay the HEAL obligation, including the debtor's financial situation over the course of time when payments were due; the debtor's voluntary undertaking of additional financial burdens despite his knowledge of the outstanding HEAL debt; and the percentage of the debtor's total indebtedness represented by student loans." *Rice*, 78 F.3d at 1150.

### B.

To flesh out the unconscionability standard, we have canvassed the decisions of courts applying that standard to the varied financial situations faced by HEAL debtors. After analyzing the above factors, courts have found nondischarge of HEAL loans unconscionable only in rare cases. *See id.* ("Given the extreme nature of Congress' chosen standard for the discharge of HEAL loans, we believe that in all but the most difficult cases the question of whether the debtor has satisfied that standard will be obvious.").

Thus, courts generally have refused to hold nondischarge unconscionable even though the debtor earned only a modest income and the amount of the HEAL debt was substantial. For example, in *Rice*, the debtor owed $77,000 in HEAL loans and his family, which included three children (ages 10, 7, and 4), grossed $60,000 annually. *Id.* at 1147, 1150-51. Moreover, the debtor, age 41, was relatively

young and healthy, and in all likelihood his income could increase in the future. *Id.* at 1147, 1150. The family owned a mortgaged home, an old automobile, and spent $200 per month for school tuition and $100 per month for recreation. *Id.* at 1147, 1151 n.7. The court found repayment would not force the family to maintain a standard of living below or even near the poverty level. *Id.* at 1150. Furthermore, the substantial amount of the HEAL debt at the time of the petition "was largely [the debtor's] own doing" because of his minimal repayments. *Id.* at 1150. For all of these reasons, the court held as a matter of law that nondischarge of this debt was not unconscionable. *Id.* at 1150.

Similarly, in *Malloy*, the district court denied a $62,000 discharge to the debtor, a thirty-nine-year-old man with no dependents, who had failed to graduate from medical school, but was college educated. 155 B.R. at 947, 943.[6] He lived with a roommate to save on rent and his mother helped him purchase clothes. *Id.* at 947. The court, however, found the debtor "arguably . . . underemployed," earning only $11,500 per year as an assistant activities director at a nursing home, and concluded that the debtor, with effort, could increase his income. *Id.* at 947. Further, the court noted that the debtor had not made substantial job search efforts in the prior five years and had requested multiple forbearances. *Id.* at 944 n.3, 947-48. Based on these facts, the district court refused to affirm discharge of the HEAL loan. *Id.* at 943, 948.

*In re Pinkham*, 224 B.R. 728 (Bankr. E.D. Mo. 1998), is also apposite. In that case, a debtor, age 43, had borrowed money under the HEAL program to finance his chiropractic degree, attempted to build a practice for five years, was unable to do so, and then accepted employment as a high school science teacher. *Id.* at 730. The debtor earned only $40,000 per year and did not anticipate earning significantly more in the foreseeable future. *Id.* He supported his wife (who did not work outside of the home), and two children, ages 11 and 15. *Id.* But, the court noted that the debtor "could supplement his earnings with seasonal employment," that he was not in "less than average" health, and that he had not argued that his wife and sons were "unable to contribute financially toward their support." *Id.* at 733. On these

---

[6]Malloy received discharges of approximately $34,000 in other educational loans, rulings not appealed to the district court. *Id.* at 943, 944-45.

facts, the court refused to discharge $132,000 in HEAL debt. *Id.* at 730, 733.

In *In re Barrows*, 182 B.R. 640, 643 (D.N.H. 1994), the debtor, a dentist, sought a discharge of $186,000 in HEAL loans. The debtor's combined family income ranged from $55,000 to only $20,000 in the years immediately prior to the bankruptcy court's decision. *Id.* at 646. Moreover, the debtor had entered into an agreement with the IRS to use her annual salary above $20,000 for several years to satisfy back payroll taxes. *Id.* The debtor and her husband, who had no dependents, lived in a condominium owned by the debtor's aunt to whom they paid rent. *Id.* The bankruptcy court noted that the debtor suffered from "a series of physical problems relating to various illnesses including iritis, episodes of lupus, and back trouble resulting from spina bifida, a birth defect." *Id.* at 647. Yet, despite the debtor's relatively low income and her health problems, the bankruptcy court refused to discharge either $186,000 in HEAL debt or $28,000 in other educational loans. *Id.* at 644 n.6, 649-50, 652. It reasoned that, although the debtor had suffered setbacks in her dental practice, she had a promising future, and that her history had "shown that her illnesses [were] not so severe that she [was] permanently unable to work." *Id.* at 649.

In *In re Borrero*, 208 B.R. 792, 794 (Bankr. D. Conn. 1997), *aff'd*, 1997 WL 695515, at *1 (D. Conn. 1997), the unmarried debtor, age 34, had been involuntarily dismissed from medical school. He worked as a lab technician, earning $31,000 per year, with the possibility of earning up to $35,000 over the next few years, but had made only minimal repayments on his educational loans. *Id.* at 794-97. The debtor's financial condition had been improved by a general discharge of $39,000. *Id.* at 797. Given these facts, the bankruptcy court refused to discharge $112,000 in HEAL loans, as well as $54,000 in other educational loans. *Id.* at 795, 798.

Similarly, in *In re Hines*, 63 B.R. 731, 733, 737 (Bankr. S.D. 1986), the bankruptcy court denied an $11,000 HEAL discharge to another debtor, who had been dismissed from medical school. The debtor, who was in good health, was married with two children, ages 2 and 4. *Id.* at 733. He had worked as a chimney sweep, bartender, satellite dish salesman, and at a nursery. *Id.* He represented that he

averaged only $2,000 per year in income, and his wife earned about $7,000 per year. *Id.* At the time of filing for bankruptcy, the debtor had started a tire business, but still only earned about $262 per month against $500 in expenses. *Id.* The bankruptcy court refused to discharge the HEAL debt, explaining that "[n]either several years of underemployment nor beginning your own tire business" warranted discharge. *Id.* at 737.

Conversely, *In re Kline*, 155 B.R. 762 (Bankr. W.D. Mo. 1993), seems to typify the very extreme case warranting discharge of a HEAL loan. In *Kline*, the bankruptcy court granted a $36,000 discharge to a debtor who suffered from depression, anxiety, and panic attacks, and had attempted suicide, been raped at gunpoint by an employer, sexually harassed at another job, and abused by her spouse. *Id.* at 764 n.1, 765. The debtor had worked "several jobs, primarily near-minimum wage positions," but "[a]t each job, she was fired after a short period." *Id.* at 764. At the time of the trial, the debtor had worked for the prior 10 months as a computer programmer, earning $21,700 per year, but she apparently lost that job as well. *Id.* Given these facts, the court found that the debtor, who had an eight-year-old son, was "unable to maintain meaningful employment for more than a short period of time." *Id.* at 765. The court discharged the HEAL debt, concluding that the "[d]ebtor has longstanding mental and emotional conditions that the evidence shows are likely to be permanent" and "[t]hese conditions render her incapable of functioning in a manner to enable her to maintain a job." *Id.* at 768.

Similarly, in *In re Nelson*, 183 B.R. 972, 974, 977 (Bankr. S.D. Fla. 1995), the bankruptcy court granted a HEAL discharge of approximately $27,000 to a debtor who had a nervous breakdown, was unable to finish medical school, and suffered from "Recurrent Major Depression with Psychotic Features, and slight Paranoia." *Id.* The debtor earned $9.41 per hour; the bankruptcy court held that the debtor was "unable to financially support herself, and if she earned more money, she would only have to pay her true share of her medical and psychiatric bills." *Id.* at 977. The court concluded that the debtor's "emotional and psychological impairments prevent her from

functioning as a participating member of society and maintaining a job which would allow her to become totally self-supportive." *Id.*[7]

With this precedent and these principles in mind, we consider the instant case.

## IV.

### A.

We note at the outset that the reasoning of the bankruptcy court, which the district court largely adopted, was flawed in several respects.

First, although the bankruptcy court recognized that it must find nondischarge of the HEAL loan to be "unconscionable" in order to justify discharge, the court did not seem to appreciate the very demanding nature of that standard. Thus, in its brief opinions, the court did not define or even discuss the meaning of "unconscionable." It did not mention a single case involving this standard or engage in any discussion of many of the relevant considerations set forth above.

Second, while the bankruptcy court recognized that differing standards govern discharge of the ECMC loans and the HEAL loans, its analysis improperly combined the loans. *See* J.A. 260 ("It is apparent to the court that Mr. Smitley cannot possibly repay his educational loans that total more than $170,000 [sic][.]"[8]); J.A. 271 ("Even if Mr. Smitley were to make the payments according to the repayment schedule submitted [for both loans], not only would he never fully repay the loan, but he would also never reduce the principal due."). This approach is flawed. Because different standards control dis-

---

[7]In *In re Soler*, 261 B.R. 444, 448, 452-53 & n.3 (Bankr. D. Minn. 2001), the bankruptcy court granted a discharge of some HEAL loans to a debtor who had health problems exacerbated by her work as dentist, had made repaying her student loans "*the* driving force" in her life, and lived an extremely frugal life. *Id.* (emphasis in original).

[8]As noted above, the $170,000 figure is erroneous; the record is clear that the total due on the HEAL and non-HEAL loans approximated $131,000.

charge of the loans — with the HEAL loans subject to the more strin-gent unconscionability standard — the bankruptcy court should have considered the HEAL and non-HEAL (ECMC) loans separately, rather than focusing on the combined total amount of indebtedness. The court should have initially considered discharge of the non-HEAL (ECMC) loans, subject to the lesser undue hardship standard, since the disposition of that debt could affect the unconscionability analysis, especially because the bankruptcy court determined to dis-charge the non-HEAL (ECMC) loans. *See, e.g.*, *Barrows*, 182 B.R. at 648-50; *In re Greco*, 251 B.R. 670, 675, 678 (Bankr. E.D. Pa. 2000); *In re Borrero*, 208 B.R. at 795, 797-98. Furthermore, improperly con-sidering the HEAL and non-HEAL (ECMC) loans together led the bankruptcy court to conclude that the interest would accrue faster ($11,000 per year) than the annual income contingent payments ($4,000 per year). If the court had initially considered the non-HEAL (ECMC) loans, it would not have so concluded, particularly given its discharge of those loans. Then only the HEAL loans would remain, and the record indicates that interest on the HEAL loans has accrued "at the rate of 8.25% per annum and a rate of $8.98 per day" or $3,277 per year.[9] Therefore, the income contingent payment of $327 per month, or approximately $4,000 per year, would result in full pay-ment of the accruing HEAL interest plus some principal.

---

[9]Based on these figures, the record suggests that interest is only calcu-lated on the stipulated $40,954 principal balance, which yields an annual interest payment of approximately $3,300 ($40,954 x 8.25% = $3,378). (The principal balance figure of $40,954 is the state court judgment amount obtained by Student Loan Marketing Association and assigned to HHS, and the remainder of the $63,000 total HEAL debt is $22,569 in accrued interest.) We recognize, of course, that 8.25% per year based on a total debt amount of $63,000 yields a larger annual interest accrual than $3,300 (*i.e.*, $63,000 x 8.25% = $5,197). But at oral argument HHS counsel repeated the figure of $8.98 per day and roughly estimated an annual interest accrual of $3,300 — without challenge from Smitley's counsel. We further note that this state court judgment set an interest rate of 8%, as did the Repayment Agreement between Smitley and HHS. At oral argument, HHS asserted, however, that interest is currently accruing at a lower rate (under 5%), given the historically low interest rates at the present time. We do not rely on the current lower interest rate because HHS pointed to no record evidence supporting it and the rate could pre-sumably rise again in the future.

Finally, the bankruptcy court misinterpreted the undisputed facts in concluding that Smitley would continue to pay the HEAL loans for the rest of his life. The Direct Loans Repayment Calculator Summary and Smitley's letter, both in the record and submitted in response to the bankruptcy court's order, indicate that the income contingent "plan has a maximum term of 25 years." Moreover, at oral argument before us, Smitley's counsel conceded that the plan would only require 25 years of payment, followed by forgiveness of the debt. *Cf.* http://www.ed.gov/directloan (Interactive Calculators/Description of Repayment Plans) (last visited July 7, 2003) ("If you haven't fully repaid your loans after 25 years under this plan, the unpaid portion will be discharged. You will, however, have to pay taxes on the amount that is discharged."). Thus, under the income contingent repayment plan, Smitley would only pay toward the HEAL debt for 25 years, and he would do so at a rate that would cover both the accruing interest and some principal.[10]

B.

If the bankruptcy court had applied the correct legal analysis to the undisputed facts, it could only have concluded that it would not be "unconscionable," *i.e.* "shockingly unfair, harsh or unjust," to deny discharge of Smitley's HEAL loans.

The Smitley family grossed $42,000 per year in 2000, the year immediately following the bankruptcy filing. This is not a substantial income, but, as in *Rice*, 78 F.3d at 1150, repayment of the HEAL loan would "not force" the family "to maintain a standard of living below or even near the poverty level." *See* Annual Update of HHS Poverty Guidelines, 65 Fed. Reg. 7555 (Feb. 15, 2000) ($22,850 for a family of six); *cf. Hines*, 63 B.R. at 733 (denial of discharge to debtor, with spouse and two young children, grossing only $9,000 per year in 1986). Although not dispositive, the Poverty Guidelines provide at least a modicum of objectivity in assessing unconscionability. Certainly no court has suggested and not even Smitley contends, as the

---

[10]Even if the annual interest accrual outpaced Smitley's annual income contingent payments, the fact that the debt would be forgiven after 25 years renders that point moot and certainly would not support a finding of unconscionability in this case.

dissent seems to, that if his family income (after taxes) does not exceed twice the "government-set poverty figure" for a family of six that this should be a factor weighing in *favor* of discharge.

Like debtors denied HEAL discharges in other cases, Smitley, age 47 at the time of trial, enjoys good health. *See Rice*, 78 F.3d at 1150 (noting that debtor was "relatively young as well as healthy"); *Malloy*, 155 B.R. at 943, 947 (noting debtor's good health); *Borrero*, 208 B.R. at 794 (same); *Hines*, 63 B.R. at 733 (same); *Pinkham*, 224 B.R. at 733 (considering debtor's relatively young age, 43, and good health); *cf. Barrows*, 182 B.R. at 649 (denying HEAL discharge despite debtor's "series of physical problems"). Thus, this factor too weighs against discharge.

Moreover, both Smitley and his wife have stable employment, another factor weighing against discharge. *See Rice*, 78 F.3d at 1150. Perhaps even more importantly, neither of the Smitleys works 40 hours per week and, like the debtor in *Malloy*, 155 B.R. at 944 n.3, 947-48, Smitley has not made substantial job search efforts. Contrary to the suggestion of our friend in dissent, the bankruptcy court's finding (which we do not "ignore," *see supra* at 23) that Smitley "has no prospects for other employment," is *not* a finding that Smitley would not have had such prospects *if* he had made substantial job search efforts to find other employment. Indeed, the bankruptcy court also found, Smitley "is probably underemployed as a carpenter." J.A. 260. *Cf. Malloy*, 155 B.R. at 947 (finding that debtor, earning $11,500 per year as an assistant activities director at a nursing home, "arguably now underemployed, . . . given his college degree"); *see also Hines*, 63 B.R. 737 (noting debtor's "several years of underemployment").

Even recognizing that Smitley's chiropractic and teaching licenses had lapsed at the time of trial, Smitley's underemployment is apparent. Additionally, we note that Smitley himself acknowledged in testimony before the Bankruptcy Court that he had *not* "explored the possible hours [he] could get from another finish carpenter," made only a few attempts to obtain part-time or evening jobs at retailers and grocery stores, and did not seek positions as a factory foreman (for which he had prior experience), positions in other geographic areas (except for a teaching position at a college in Ohio), or employment counseling of any kind. J.A. 40-45. Certainly, it would not be "uncon-

scionable" to require Smitley to work full-time and to supplement his income with secondary part-time work.[11] *See Rice*, 78 F.3d at 1150; *Pinkham*, 224 B.R. at 730 (debtor, a full-time teacher, could supplement his income with seasonal employment).

Furthermore, although the amount of the HEAL debt — $63,000 — is significant, it is a good deal less than other HEAL debts that courts have refused to discharge. *See Rice*, 78 F.3d at 1147 ($77,000 in HEAL debt); *Borrero*, 208 B.R. 795, 798 ($112,000 in HEAL debt); *Barrows*, 182 B.R. at 643 ($186,000 in HEAL debt); *Pinkham*, 224 B.R. at 730 ($132,000 in HEAL debt); *see also Malloy*, 155 B.R. at 942 ($62,000 in HEAL debt). Moreover, Smitley bears responsibility for the debt's escalation from the original $27,000 in HEAL loans. He requested and received forbearances for almost two years and made no repayments during that period. J.A. 161. After the forbearance period ended, Smitley repaid his HEAL loan for a few years at the rate of only $100 per month. The dissent argues that "[w]hat is important" is whether Smitley's "forbearances and small payments were justified." We agree, but in arguing that they were justified here, the dissent ignores critical undisputed facts. Namely, over the years, Smitley never increased his monthly $100 HEAL repayment, even though during this period the family income increased more than $20,000 to between $60,000 to $80,000 in some years, and Smitley had agreed in writing with HHS to "increase [his] monthly payment" on the HEAL debt if he attained "*any* increase in income." J.A. 50-52; 156. (Emphasis added).[12] Thus, this is another factor that weighs against finding that refusal to discharge Smitley's HEAL debt would be unconscionable.

---

[11]We accept the undisputed fact that Mrs. Smitley could not, at the time of trial, work more than 30-35 hours per week because of an undiagnosed problem with her hands.

[12]During the same period in which, notwithstanding the substantial increase in family income, Smitley failed to abide by his promise to increase his monthly HEAL repayment, the Smitley family made three annual contributions of $3,000 to $5,800 to charities of their own choosing. *See Rice*, 78 F.3d at 1150 (court should examine the "debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding HEAL debt").

In addition, like the debtor in *Borrero*, 208 B.R. at 794, who was not granted discharge of $112,000 in HEAL loans, Smitley's financial condition has improved because he has received a discharge of other debts. Smitley, with an income of $42,000 and $63,000 in HEAL debt, has received a general discharge of over $100,000 and a discharge of the $68,000 ECMC educational debt. However, the debtor in *Borrero*, 708 B.R. at 797, with an income of $31,000 (in 1996) and $112,000 in HEAL debt, was denied a discharge of $54,000 in other educational debts and granted only a $39,000 general discharge, and the debtor in *Barrows*, 182 B.R. at 643-44 & n.6, with a likely combined family income of approximately $30,000 (in the mid-1990s), was denied a discharge of $186,000 in HEAL debt *and* $28,000 in other educational debt.

Finally, although we have no wish to micromanage anyone's life, we must also, with respect, assess Smitley's claimed expenses to determine if nondischarge of his HEAL debt would be "unconscionable." *Cf. Rice*, 78 F.3d at 1151 ("Because the HEAL discharge standard is a particularly stringent one, the court must necessarily be unforgivingly critical in its assessment of the debtor's claimed expenses for himself and his dependents."). At the time of the April 2001 trial, two of Smitley's dependents were 17 years old — just one year away from majority — and another was also a teenager, leaving only one child under the age of 10. Smitley rents a two-level, three-bedroom house for $1,250 a month, owes a car payment of $434 per month on one of his automobiles (a van), and also lists $100 per month for recreation, clubs, entertainment, newspapers, and magazines. *See id.* at 1151 (noting that claimed monthly expenses included $100 for recreation/vacations). Surely, as his children reach age 18 (and possibly even before), Smitley could at least reduce his monthly shelter and transportation expenses (or request contributions toward housing and food from his children after they reach majority).

Given the totality of the undisputed facts and the stringent standard for discharge under § 292f(g), nondischarge of Smitley's $63,000 HEAL debt would not be unconscionable. Moreover, at oral argument, HHS assured us that it remains willing to work with Smitley on a repayment program and that he would likely still be eligible for the income contingent repayment plan. In view of all of these facts, a court would be hard-pressed indeed to find it "shockingly unfair,

harsh, or unjust" to require Smitley to make income-sensitive repayments toward his HEAL debt for the next 25 years. Rather, in this case, it would be unfair to require taxpayers, who paid for Smitley's chiropractic degree, to bear the burden of discharge.

V.

For the foregoing reasons, the judgment of the district court is reversed.

*REVERSED*

MICHAEL, Circuit Judge, dissenting:

Todd Smitley, a Chapter 7 debtor who now works as a carpenter, has demonstrated that it would be unconscionable to deny him a discharge of his Health Education Assistance Loan (HEAL) debt. Smitley and his wife have no prospects for increasing their income, and their family's bare-bones expenses exceed their total income. Smitley's family will suffer if he is denied a discharge. He will be able to make payments on his HEAL loan only if he neglects some of the essential needs of his family. Accordingly, I respectfully dissent from the majority's decision to reverse the discharge of Smitley's HEAL debt.

The HEAL program allows graduate students in the health professions to finance their educations with federally insured loans. *See* 42 U.S.C. §§ 292, 292*o*. A HEAL debt may be discharged in bankruptcy, but the debtor must satisfy a strict standard. Discharge requires "a finding by the Bankruptcy Court that the nondischarge of [the HEAL] debt would be unconscionable." *Id.* § 292f(g)(2). The statute does not define "unconscionable," and I accept the majority's choice of the following dictionary definitions of the word: "'excessive;' 'exorbitant;' 'lying outside the limits of what is reasonable or acceptable;' 'shockingly unfair, harsh, or unjust;' or 'outrageous.'" *Ante* at 8 (quoting Webster's Third New International Dictionary 2486 (1993)). This fairly broad definitional range should give a bankruptcy court some latitude in deciding whether to find that nondischarge would be unconscionable. For example, it is easier to find that nondischarge

would "l[ie] outside the limits of what is reasonable" than it is to find that nondischarge would be "shockingly unfair" or "outrageous." Because "what is unconscionable defies precise definition," one bankruptcy court has "likened [unconscionability] to beauty in that it appears to the senses and is found in the eyes of the beholder." *In re Hines*, 63 B.R. 731, 736 (Bankr. D. S.D. 1986).

In an effort to impose some objectivity, the majority follows other courts and lists a number of factors that a court may consider in conducting the unconscionability analysis. These factors include the debtor's (1) income, (2) age, (3) health, (4) earning ability, (5) educational background, including professional degrees, (6) prospects for increasing income, including efforts to make that happen, (7) dependents and whether they are able to contribute, (8) accumulated wealth, (9) total HEAL debt (the debtor's role in accruing the debt, including forbearance requests and payment history, is relevant), and (10) expenses and ability to pay HEAL debt. *See ante* at 9-10.

I do not quarrel with the majority's list of factors. The list should be used, however, as a general guide to the examination of the debtor's overall circumstances and his efforts. As the majority points out, "a court must focus on the 'totality of the facts and circumstances surrounding the debtor and the obligation.'" *Ante* at 9 (quoting *In re Rice*, 78 F.3d 1144, 1149 (6th Cir. 1996)). Thus, the majority's list of factors, which is lengthy, should not be used to reduce the unconscionability analysis to some rigid, formula-driven calculation. This is because the unconscionability determination is an equitable one. In the end, the debtor's good faith, or lack of it, must count for a lot. *See In re Rice*, 78 F.3d at 1150 ("[W]e believe the debtor's good faith to be an appropriate and necessary consideration" in the unconscionability determination). When I conduct the de novo review in this case, applying essentially the same standards as the majority, I come to a completely different conclusion: it would be unconscionable to deny Smitley a discharge of his HEAL debt. I will explain why, starting with the factors listed by the majority.

(1) *Income*. Smitley and his wife have a combined gross income of about $42,000 ($37,000 net of taxes). The majority counts this annual income level against Smitley, stating that "repayment of the HEAL loan would not force the family to maintain a standard of living below

or even near the poverty level." *Ante* at 16 (citing Annual Update of HHS Poverty Guidelines, 65 Fed. Reg. 7555 (Fed. 15, 2000) (quotation marks omitted)). Because the poverty threshold marks a point of desperation, I would not use the federal poverty guidelines to gauge when it becomes unconscionable not to discharge a HEAL debt. Recent studies indicate that the method currently used by the federal government to set poverty levels is "conceptually insufficient for measuring the basic income needs of a working family." Jared Bernstein et al., How Much Is Enough? 1 (Economic Policy Institute, 2000) (see also studies cited therein); Measuring Poverty: A New Approach (Constance F. Citro & Robert T. Michael eds., National Academy Press, 1995) (proposal by National Research Council for developing new approach to official poverty measure in U.S.). A study commissioned by the Economic Policy Institute concludes that the average family requires income of twice the government-set poverty figure in order to maintain "a safe and decent standard of living." Bernstein et al., *supra*, at 1, 64. In 2000, shortly before Smitley's trial, poverty level income for a family of six (the size of the Smitley family at the time) was $22,850. Doubling that to reach the "safe and decent" level would require $45,700, or $3,700 more than the Smitleys made. The Smitleys are definitely short of the income necessary to reach the minimum safety level, for they cannot afford health insurance. The Smitleys' $42,000 gross income level is not adequate by any reasonable standard, and it should weigh in favor of discharge.

(2) and (3). *Age and health*. Smitley was 47 years old at the time of the trial, so he has a good many years of earning capacity left. Smitley testified that his health is good, but he said that he had not had a physical examination for seven years. Smitley had a serious medical problem a few years ago when he ruptured an artery in his leg and was hospitalized for ten days. He did not return to full-time work for six weeks, and his uninsured status left him with $22,000 in medical bills that he had to pay. A comparable health problem in the future would likely send the Smitleys back into bankruptcy.

(4) - (6). *Earning ability; education; prospects and efforts for increasing earnings*. The majority notes that "Smitley and his wife have stable employment" and weighs this against discharge. *Ante* at 17. Stable employment should not be an automatic penalty. As a general rule, it shows good faith and a sense of duty. What is more

important is the earnings total (which I have already discussed) and whether sufficient effort has been made to increase the total. As for Mrs. Smitley, who works as a dental assistant, the bankruptcy judge found that "she has no real prospect for advancement" in her employment. Moreover, the majority accepts that Mrs. Smitley cannot work more than the weekly total of 30 to 35 hours she puts in at two part-time jobs. *Ante* at 18 n.11. She cannot do more as a result of a hand problem that has not been diagnosed or treated because she cannot afford to see a doctor.

As for Smitley himself, the majority concludes that he "has not made substantial job search efforts" to find a position more appropriate to his level of education or to find part-time work to supplement his current wages. *Ante* at 17. This conclusion, which is key to the majority's decision, runs head-on into the bankruptcy judge's finding that Smitley has no prospects for improving his employment situation. Specifically, the judge found that Smitley "is probably underemployed as a carpenter, *but he has no prospects for other employment.*" (emphasis added). Because this finding is not clearly erroneous, it cannot be set aside. Fed. R. Bankr. P. 8013. Nor can it be ignored.

Smitley once held a certificate to teach in secondary schools, but his certificate lapsed more than twenty years ago. His chiropractor's license expired in 1999 because he could not afford to enroll in the required seminars for continuing education. Now, Smitley cannot afford the courses necessary to prepare for the state board examinations that would be a prerequisite for the reinstatement of his chiropractor's license. Thus, although Smitley's prior education as a teacher and a chiropractor make it appear that he is now underemployed in his job as a finish carpenter, the bankruptcy judge was correct in not holding this against him. Smitley simply lacks the money to be retrained and relicensed in his prior professions.

The majority concludes that even if Smitley cannot market himself as a licensed professional, he did not make substantial efforts to find either a better job or a supplemental part-time job. *See ante* at 19-20. I respectfully suggest that the record shows that Smitley has made an adequate, albeit unsuccessful, effort to find better work or more work and that the bankruptcy judge's finding that he "has no prospects for other employment" is fully supported. First, Smitley registered with

two employment agencies and followed up with inquiries. Second, he sought evening and part-time jobs with several grocery stores and retailers, including Target and Kmart. Third, he applied with Cisco Systems and got an encouraging response until the company imposed a hiring freeze. Fourth, he applied to several technical schools and colleges, including one out-of-state college, for teaching positions in the science and health care areas. Fifth, he told his current employer that he needs more hours. Sixth, he talked with members of his church who are in management positions, letting them know that he is looking for a better job. Finally, at the time of the trial he was still actively looking for a better position or part-time work. This effort, though wholly unsuccessful, is sufficient to support the bankruptcy judge's finding that Smitley has no real prospects for a better job. In short, Smitley's job search has been earnest and adequate, and his lack of success should not be held against him.

(7) *Dependents and whether they are able to contribute to their support*. The Smitleys have five children, four of whom were dependents on the date of the trial, April 12, 2001. The oldest of the dependents, twin daughters who were seventeen (juniors in high school) on the date of trial, worked part-time to pay for their activities. The other two dependents are a son who was around thirteen at trial time and a daughter who was around seven. The son should be old enough by now to find some way to contribute.

(8) *Accumulated wealth*. The Smitleys have no savings or investments, and they do not own a home. Mrs. Smitley has a $10,000 retirement account funded by employer contributions.

(9) *Total HEAL debt; forbearances and payment history*. Smitley's total HEAL debt is $63,000, with interest currently accruing at the rate of 8.25 percent per year. I cannot argue with the majority's statement that "Smitley bears responsibility for the [HEAL] debt's escalation from the original $27,000" because he "received forbearances for almost two years" and "then paid only $100 per month." *Ante* at 18. Forbearances and small payments do not automatically prevent a debtor from obtaining the discharge of a HEAL debt, however. *See, e.g.*, *In re Soler*, 261 B.R. 444, 450 (Bankr. D. Minn. 2001). What is important is whether the forbearances and small payments were justified. They were justified in Smitley's case because, despite reason-

able efforts on his part, his chiropractic practice floundered for thirteen years and finally folded. During this time Smitley and his wife had to support five children. The majority indicates that the size of Smitley's HEAL debt might have been smaller if the Smitleys had not been so generous with their contributions to their church for three years (1995-1997) when they made annual contributions of between $3,000 and $5,800. *See ante* at 18 n.12. I would not hold these contributions against Smitley. The Smitleys have not lived extravagant lives, and they no longer contribute to their church. Indeed, in recent times they have had to rely on the charity of members of their church, who have given the Smitleys money to help meet expenses.

(10) *Expenses and ability to pay HEAL debt*. The majority says that Smitley's financial situation has improved because he has received a discharge of other debts. Yet the reduction of Smitley's accumulated debt burden does not tell us very much about whether he can afford to make monthly payments of $327 against the HEAL debt for the next twenty-five years. We have to look at the family's income and its reasonable expenses to determine Smitley's ability to pay. The Smitleys' income net of taxes is about $37,000 a year, or about $3,100 a month. The family has monthly living expenses — all of which appear to be reasonable — of about $3,700, *or $600 in excess of income*. Their living expenses include rent ($1,250), utilities ($340), car payment ($434), delinquent tax payments ($300), insurance ($93), clothing ($100), food (approximately $600), gasoline (approximately $200), and medical expenses ($355). The majority challenges these expenses by saying that as Smitley's children reach age eighteen, he "could at least reduce his monthly shelter and transportation expenses." *Ante* at 19. Although the twin daughters are now over eighteen, there is not much room for a reduction of these expenses. If the twins have moved out of the home, it would be reasonable for the Smitleys to retain the three-bedroom house so that the two remaining children could have separate bedrooms. Even if the twins are still at home and working, it is not realistic to expect that they are a long-term solution to reducing the Smitleys' expenses for shelter. And, while the fact that the twins have reached majority might have brought a marginal reduction in Smitley's transportation expenses, I doubt that this reduction would do much to make up the $600 gap between total expenses and available revenue. Simply put,

the Smitleys do not have the extra money to pay $327 a month against the HEAL loan.

(11) *Good faith.* I sense that the majority has decided that Smitley has not tried hard enough; specifically, he did not try hard enough to pay down the HEAL loan while he had his chiropractic office open; he has not tried hard enough to find a better job or to find part-time work; and he has not tried hard enough to reduce family living expenses. Effort and good faith are important to be sure, and I believe that Smitley has exhibited both in sufficient measure.

Smitley went to chiropractic school, using a HEAL loan, in order to do better for himself and his family. After graduating in 1986, Smitley struggled for thirteen years to make a go of it as a chiropractor. Much went wrong. He attempted to get started in his new profession by buying another chiropractor's practice. Smitley bought what he thought was a thriving practice, but it proved to be a marginal venture from the very start. Many of the patients switched to other chiropractors, and Smitley did not have the capital to do extensive advertising. Smitley labored for five or six years to build what might have been a decent practice. Indeed, in the early part of the 1990s his practice actually "pick[ed] up" for a time, and it looked as though Smitley might finally achieve success. Then, he was caught simultaneously by hard luck and structural change in the health care industry. A fire destroyed "almost everything" in Smitley's office. Not long after the fire, he ruptured an artery in his leg, was hospitalized, and lost nearly two months of full-time work. At about the same time, the advent of health maintenance organizations and preferred provider organizations cut into Smitley's patient base. According to Smitley, he could only afford the fees to participate in two HMOs. Smitley struggled along in his practice for awhile longer, and before it failed entirely, he began supplementing his income with part-time finish carpentry work. Finally, one day in late 1999, he went to the office and found that the electricity had been turned off (he could not afford to pay the utility bill). That was the day Smitley closed his practice.

The Smitleys have a lifestyle that is quite modest. They live in a rented house (for several years seven family members were crowded into their three-bedroom rental). They always buy used cars, and they do not take vacations. Most of the time they buy their clothing on

credit. Smitley and his wife cannot afford health insurance. Their children have health insurance through a state public assistance program. The twin daughters did not get driver's licenses because the Smitleys could not afford the extra auto insurance premiums required to cover young drivers. The Smitleys have no savings, and their three older children are not going to college. In 1999 Smitley cashed in his life insurance policy and applied the $9,500 in proceeds to pay the family's bills. Both Smitley and his wife have worked steadily, and they have managed to provide just the basics for a large family. I believe they have acted in good faith.

* * *

The examination of the relevant factors reveals that the majority makes three fundamental mistakes in concluding that it is *not* unconscionable to deny Smitley a discharge of his HEAL debt. First, the majority relies too much on the poverty guidelines in denying the discharge. Requiring Smitley to repay the HEAL loan, the majority says, will not force the Smitleys to live below or even near the poverty level. The unconscionability threshold, however, is crossed well before the poverty line is reached. A family requires double the poverty guidelines figure to maintain a decent standard of living, and the Smitleys' income is short of the required level. Second, the majority concludes that Smitley has not made substantial efforts to find a better job or a part-time job that would supplement his current income. This conclusion is foreclosed by the bankruptcy judge's finding that Smitley "has no prospects for other employment." It is thus established as a fact that Smitley has no prospects for increasing his income. The same goes for Mrs. Smitley. Third, the majority suggests that Smitley could somehow reduce the family's living expenses. As the bankruptcy judge found, the Smitleys' "monthly expenses exceed their monthly income." The Smitleys' expenses are bare bones, covering mainly the essentials such as rent, utilities, food, clothing, and transportation. The expenses would have to be cut about ten percent to make room for a monthly HEAL debt payment of $327. An expense cut of that size would push the Smitley family's budget to the breaking point and deprive the family of any chance for a decent standard of living. Already, Smitley and his wife cannot afford health insurance. What else will the Smitleys have to do without to make payments on the HEAL loan? Will they have to move to a two-bedroom

house, depriving their young son and daughter of separate bedrooms? To save on utility costs, will they have to turn down the thermostat to the point of discomfort when the weather gets cold? Will they have to reduce their modest expenses for food and clothing? Cuts like these will have to be made for Smitley to make payments on the HEAL debt. That result will, I believe, be detrimental to the stability and well being of the Smitley family.

Todd Smitley has acted in good faith, and the other relevant factors establish that his family is barely getting by. It would be unconscionable to push Smitley any further and unconscionable not to discharge his HEAL debt. Because the majority reverses the discharge and reinstates the HEAL debt, I respectfully dissent.