**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IN RE LARRY LEE WOODY,

    Debtor.

LARRY LEE WOODY,

    Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT
OF JUSTICE,

    Defendant-Appellant.

No. 06-3294

**Appeal from the United States Bankruptcy**
**Appellate Panel of the Tenth Circuit**
**(B.A.P. No. KS-05-124)**

Jonathan H. Levy, Attorney, Department of Justice (Peter D. Keisler, Assistant
Attorney General; Eric F. Melgren, United States Attorney; and Robert M. Loeb,
Department of Justice Attorney, with him on the briefs), Washington, D.C., for
Defendant-Appellant.

Kenneth Michael Gay, Consumer Advocate, L.L.C., Lenexa, Kansas, for Plaintiff-
Appellee.

Before **BRISCOE, EBEL,** and **HARTZ,** Circuit Judges.

**EBEL**, Circuit Judge.

The United States Department of Justice (the "DOJ") appeals a judgment of the United States Bankruptcy Appellate Panel for the Tenth Circuit ("BAP") affirming the District of Kansas Bankruptcy Court's discharge of Larry Lee Woody's Health Education and Assistance Loan ("HEAL loan") debt. Pursuant to 42 U.S.C. § 292f(g), HEAL loan debt may be discharged only if nondischarge of the debt would be "unconscionable."

The DOJ argues that the bankruptcy court erred in concluding that it would be unconscionable to deny Mr. Woody a discharge of his HEAL loan debt. We agree. Under the correct standard for dischargeability, Mr. Woody failed to demonstrate that nondischarge of his HEAL loan would be unconscionable. We therefore REVERSE the BAP's judgment affirming the bankruptcy court's discharge of Mr. Woody's HEAL loan and order the full amount of his remaining HEAL loan obligation reinstated.

I.    **BACKGROUND**

A.    **Factual History**

Mr. Woody accrued significant debt from two types of government-insured student loans he obtained between 1979 and 1983 as he pursued a degree in chiropractic medicine. Of his original loan obligations, $25,000 consisted of general educational loans whose dischargeability is governed by the Bankruptcy

Code at 11 U.S.C. § 523(a)(8) (the "523 loans"), and $4,700 consisted of a HEAL loan subject to a separate dischargeability standard under 42 U.S.C. § 292f(g).[1] Mr. Woody's loan payments began to come due after he left his chiropractic studies in 1983; however, to date, he has contributed only $995 towards the repayment of his 523 loans and only one payment of $484.48 toward his HEAL loan. As a result of accrued interest and his failure to make regular payments on these loans, as of July 2005 Mr. Woody owed a total of over $53,000 on the 523 loans (with interest continuing to accrue at 7% annually) and over $18,750 on the HEAL loan (with interest accruing at 4.55% annually).

Mr. Woody holds an undergraduate degree in accounting. However, he never completed his chiropractic degree and, as a result, has never worked as a chiropractor. After discontinuing his chiropractic studies in 1983, he worked in mostly temporary and seasonal positions, generally earning less than $15,000 annually and collecting unemployment benefits at times. In 2001, he obtained seasonal employment with the I.R.S., and between 2001 and 2004, his annual gross income increased from $17,428 to $27,143.[2] In 2004, he accepted a full-

---

[1]While 523 loans can be used to pay for educational expenses in any field, see 11 U.S.C. § 523(a)(8)(A), (B), HEAL loans are available only for educational expenses incurred in the pursuit of a degree in the field of health or medicine, such as a chiropractic degree. See 42 U.S.C. § 292o(1).

[2]Figures for Mr. Woody's earnings and his budget are quoted from the bankruptcy court, which in turn gleaned the figures from "an overview of the record and Mr. Woody's testimony, which the Court finds credible." In re

(continued...)

time position at the I.R.S., and his annual gross income increased accordingly to an estimated $36,780 in 2005 and $38,520 in 2006.[3] In his current I.R.S. position, Mr. Woody receives subsidized health insurance as well as access to a flexible medical spending account (an "FSA") and a 401(k) retirement plan.

The bankruptcy court set out a detailed estimated monthly budget of Mr. Woody's expenses for 2005 and 2006, based on his testimony and an overview of the record. The court found that Mr. Woody had an estimated gross monthly income of $3,065 in 2005, and of $3,210 in 2006. The court also found that the following expenses were deducted from his paycheck each month:

|                          | 2005       | 2006       |
|--------------------------|------------|------------|
| Taxes and Social Security | $655.00    | $700.00    |
| Insurance                | 137.00     | 163.00     |
| Flexible Spending Account | 72.00      | 125.00     |
| Federal Retirement       | 24.00      | 26.00      |
| 401(k)                   | 210.00     | 221.00     |
| Union Dues               | 26.00      | 26.00      |
| TSP Loan                 | 85.00      | 85.00      |
|                          |            |            |
| TOTAL:                   | $1,209.00  | $1,346.00  |

Factoring in these deductions from his paycheck, Mr. Woody's estimated take-home pay each month was $1,856 in 2005, and $1,864 in 2006. The court also

---

[2](...continued)
Woody, 335 B.R. 431, 436 (Bankr. D. Kan. 2005). Neither party contests these figures.

[3]The bankruptcy court estimated Mr. Woody's 2005 and 2006 earnings, since the court's opinion was issued just prior to the end of 2005.

described Mr. Woody's estimated monthly living expenses, culled from documents he submitted to the court:

| | 2005 | 2006 |
|---|---|---|
| Apartment Rent | $585.00 | $595.00 |
| [Storage Rental] | 125.00 | 125.00 |
| Electricity | 50.00 | 55.00 |
| Natural Gas | 0.00 | 0.00 |
| Water/Sewer | 20.00 | 20.00 |
| Cable/Satellite/Internet | 17.00 | 17.00 |
| Telephone | 80.00 | 80.00 |
| Food | 200.00 | 200.00 |
| Clothing/Bedding | 30.00 | 30.00 |
| Laundry | 25.00 | 25.00 |
| Medical & Dental After Reimbursement | 128.00 | 75.00 |
| Personal Grooming | 13.00 | 15.00 |
| Recreation/Entertainment | 75.00 | 95.00 |
| Car Payment | 125.00 | 125.00 |
| Gasoline | 80.00 | 90.00 |
| Auto Repairs/Maintenance | 70.00 | 70.00 |
| Auto Insurance/Road Service | 42.00 | 42.00 |
| Auto Licenses/Personal Property Tax | 6.00 | 6.00 |
| Renter's Insurance | 15.00 | 15.00 |
| Health/Dental/Vision Insurance | 60.00 | 60.00 |
| Charitable Contributions | 25.00 | 25.00 |
| Office Supplies/Bank Charges | 17.00 | 20.00 |
| Interest Expense | 9.00 | 0.00 |
| Union Dues | 4.00 | 0.00 |
| Installment/Credit Card Payments | 100.00 | 0.00 |
| TOTAL: | $1,901.00 | $1,785.00 |

Based on this budget, Mr. Woody earned an insufficient amount to cover his monthly expenses in 2005, but managed to earn a meager surplus of $79 per month in 2006.

Mr. Woody was 58 years old at the time of his bankruptcy proceedings in 2005 and had saved what the bankruptcy court characterized as "a pittance" towards his future retirement expenses.[4] He owned no real property, and his only personal property of significant value was a fifteen-year-old pickup truck with a rebuilt engine. The state of Mr. Woody's health was not exemplary: he has heart disease and suffered a heart attack in 2000 which cost approximately $67,000 in medical expenses and precipitated his filing for bankruptcy.

**B.    Procedural History**

In 2002, Mr. Woody filed for Chapter 7 bankruptcy and sought discharge of all of his student loan obligations. On July 12, 2005, the bankruptcy court held a hearing to determine the dischargeability of the 523 loans and the HEAL loan. Discharge of 523 loans is governed by the "undue hardship" standard at 11 U.S.C. § 523(a)(8), which provides that such loans may not be discharged "unless excepting such debt from discharge . . . would impose an *undue hardship* on the

---

[4]Exactly how much Mr. Woody had accumulated for retirement expenses is unclear from the record, although the amount is unquestionably small. Mr. Woody testified that his thrift savings plan ("TSP") account — a type of retirement savings account offered to federal employees — held a balance of approximately $7,500, and that he also held two IRA accounts — one traditional and one Roth IRA — with balances of approximately $5,000 and $2,500, respectively. However, in making its oral findings of fact, the bankruptcy court stated that it found Mr. Woody's retirement savings to be "in the $10,000 range." The bankruptcy appellate panel, in contrast, stated Mr. Woody's retirement accounts to be "worth approximately $3,000." For purposes of our analysis, we simply note that Mr. Woody has saved an amount incapable of supporting him during his retirement.

debtor and the debtor's dependents . . . ." (Emphasis added). In contrast,

discharge of the HEAL loan is governed by the unconscionability standard at 42

U.S.C. § 292f(g):

> Notwithstanding any other provision of Federal or State law, a debt that is a loan insured under the [HEAL loan program] may be released by a discharge in bankruptcy under any chapter of Title 11, only if such discharge is granted - -
> (1) after the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended;
> (2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be *unconscionable*; and
> (3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt.[5]

(Emphasis added). The parties stipulated that parts (1) and (3) of § 292f(g) were

satisfied; thus, the only question before the bankruptcy court regarding the HEAL

loan was whether nondischarge of the loan would be unconscionable.

Addressing discharge of Mr. Woody's 523 loan first, the court noted that

the Tenth Circuit has adopted the Second Circuit's three-part Brunner test

defining "undue hardship." Educ. Credit Mgmt. Co. v. Polleys, 356 F.3d 1302,

1309 (10th Cir. 2004) (adopting the reasoning of Brunner v. New York State

Higher Education Services Corp., 831 F.2d 395, 396 (2d Cir. 1987)). The

Brunner test holds that the "undue hardship" standard requires a debtor to prove:

---

[5]42 U.S.C. § 292f(f) requires the Secretary to reduce federal reimbursements or payments for health services to practicing health care professionals who have defaulted on their HEAL loan obligations.

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

Polleys, 356 F.3d at 1307. Based on the Brunner factors, the court extensively analyzed Mr. Woody's income and expenses and concluded that he would suffer undue hardship if his 523 loans were not discharged. The court found that Mr. Woody "barely maintains a minimal standard of living" in light of his current budget; his financial condition was likely to persist, as his "future holds greater hardship as his earning capacity diminishes and his medical expenses increase"; and he "has been trying his best in good faith to maximize his personal and professional resources, but . . . circumstances beyond his control have kept him from repaying his student loans." The court therefore ordered discharge of Mr. Woody's 523 loan debts, including accrued interest.

The bankruptcy court then conducted a much shorter analysis of whether § 292f(g)'s unconscionability standard permitted discharge of Mr. Woody's $18,750 of accrued HEAL loan debt. The court noted that "many of this Court's findings under the Brunner test are equally applicable under an 'unconscionability' analysis," and therefore its discussion of the HEAL loan reiterated many points the court made in regard to the 523 loan discharge. Indeed, the headings in the court's discussion of the HEAL loan mirrored the three Brunner factors for

"undue hardship," focusing on Mr. Woody's "[a]ccumulated wealth, income and ability to pay," his "[a]ge, health, prospects and efforts for increased earnings," and his "good faith" in finding that nondischarge of his HEAL loan debt would be unconscionable. Accordingly, the bankruptcy court concluded that "Mr. Woody has satisfied his burden and is entitled to discharge, in their entirety, both the 523 Loan and the HEAL Loan."[6]

The United States Department of Education ("DOE") as creditor on the 523 loans, along with the DOJ as creditor on the HEAL loan, both appealed from the bankruptcy court's order. On appeal, the BAP affirmed the bankruptcy court's reasoning in its entirety and upheld the discharge of both the 523 loans and the HEAL loan.

Only the DOJ filed an appeal from the BAP's opinion affirming the bankruptcy court's order; thus, only the discharge of Mr. Woody's HEAL loan is

---

[6]The bankruptcy court first announced its findings and conclusions verbally at the close of the July 12, 2005 hearing. At that time, the court ordered Mr. Woody's 523 loans discharged in their entirety, but ordered only the accrued interest on his HEAL loan discharged, leaving the principal HEAL debt of $4,700 still due. However, the court also "reserve[d] the right to write a written decision to more accurately reflect any additional findings of fact and conclusions of law."

On December 15, 2005, the bankruptcy court exercised this reserved right and issued a written order. The written order reiterated and expanded upon the court's previous findings of fact and most of its conclusions of law but amended its judgment to order full discharge of both the principal and accrued on Mr. Woody's HEAL loan, stating that "the nondischarge of any portion of Mr. Woody's HEAL obligation would be unconscionable." The written order represents the bankruptcy court's final judgment, and thus our summary focuses on that order rather than the court's preliminary oral findings and conclusions.

at issue in this appeal. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d).

## II. DISCUSSION

This court has not previously addressed the unconscionability standard for discharge of HEAL loans under 42 U.S.C. § 292f(g). The Fourth and Sixth Circuits, however, have addressed this standard and have provided a well-considered analytical framework for determining when discharge of a HEAL loan is permitted under § 292f(g)'s strict language. We join our sister circuits in adopting this framework, which involves analysis of the totality of the debtor's circumstances. It is clear that Congress intended to invoke a stricter standard for discharge of HEAL loans than for the discharge of 523 loans. While we agree that Mr. Woody faces an uncertain financial future after his retirement, his present level of income and his apparent lack of repayment efforts over the life of the HEAL loan despite the availability of funds from which at least minimal payments could have been made convince us that he does not qualify for § 292f(g)'s rigorous discharge standard. We therefore reverse the BAP's judgment and the bankruptcy court's order discharging his outstanding HEAL loan obligations.

### A. Standard of Review

Although this appeal is from a decision by the BAP, our focus on review is upon the bankruptcy court's decision. In re Alderete, 412 F.3d 1200, 1204 (10th

Cir. 2005); accord In re Midkiff, 342 F.3d 1194, 1197 (10th Cir. 2003).  We review the bankruptcy court's factual findings for clear error.  In re Commercial Fin. Servs., Inc., 427 F.3d 804, 810 (10th Cir. 2005).  However, we review *de novo* the bankruptcy court's resolution of questions of law, including the meaning of the term "unconscionable."  See U.S. Dep't of Health & Human Servs. v. Smitley, 347 F.3d 109, 116 (4th Cir. 2003); see also In re Midkiff, 342 F.3d at 1197 ("Where . . . [t]here are no factual disputes and the issues on appeal pertain to the proper application of bankruptcy statutes and the interpretation of case law, our review is de novo."(alterations in original)).

## B.   The unconscionability standard for discharge of HEAL loan obligations pursuant to 42 U.S.C. § 292f(g)

It has now been more than ten years since the Sixth Circuit became the first federal court of appeals to consider § 292f(g)'s unconscionability standard for discharge of HEAL loans.  See In re Rice, 78 F.3d 1144 (6th Cir. 1996).  That court's analytical framework was drawn from the prevailing approach of district and bankruptcy courts, see In re Barrows, 182 B.R. 640, 650 (Bankr. D.N.H. 1994); In re Malloy, 155 B.R. 940, 945 (E.D. Va. 1993); In re Emnettt, 127 B.R. 599, 602 (Bankr. E.D. Ky. 1991), and has since been adopted by the only other circuit court to consider the issue, see Smitley, 347 F3d at 116-17.  We find the approach of these courts reasonable and we therefore join them in applying a

"totality of the circumstances" approach to the discharge of a HEAL loan pursuant to § 292f(g).

In requiring that HEAL loans may only be discharged when "the nondischarge of such debt would be unconscionable," Congress did not provide a definition of unconscionability. 42 U.S.C. § 292f(g). Courts interpreting this requirement have therefore applied the Supreme Court's maxim that "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" Smitley, 347 F.3d at 116 (quoting Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 207 (1997) (alteration in original)); see In re Rice, 78 F.3d at 1149. As such, "unconscionable" has been defined as "excessive," "exorbitant," "lying outside the limits of what is reasonable or acceptable," "shockingly unfair, harsh, or unjust," or "outrageous." Smitley, 347 F.3d at 116 (quoting Webster's Third New International Dictionary 2486 (1993)); In re Rice, 78 F.3d at 1149; see also Matthews v. Pineo, 19 F.3d 121, 124 (3d Cir. 1994) (adopting an identical definition of "unconscionable" as applied in a statute regulating discharge of other federally insured loans).

Other courts are also unanimous in finding "the standard imposed by this definition of 'unconscionability' to be significantly more stringent than the 'undue hardship' standard established for the discharge" of 523 loans. In re Rice, 78 F.3d at 1149; accord Smitley, 347 F.3d at 116-17; United States v. Wood, 925

F.2d 1580, 1583 (7th Cir. 1991). Further, courts are similarly unanimous that the burden to show unconscionability is a heavy one and is placed squarely upon the debtor. Smitley, 347 F.3d at 117; In re Rice, 78 F.3d at 1149.

With these principles in mind, it is apparent that a single test cannot reasonably take into account all of the considerations relevant to a determination of unconscionability in every case. Thus, we agree with the Fourth and Sixth Circuits that "bankruptcy courts should examine the totality of the facts and circumstances surrounding the debtor and the obligation to determine whether nondischarge of the obligation would be unconscionable." In re Rice, 78 F.3d at 1149; accord Smitley, 347 F.3d at 117. Factors which these courts have recognized as relevant in this analysis include (1) the debtor's "income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree," In re Rice, 78 F.3d at 1149; (2) the debtor's "claimed expenses and standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents," id.; (3) whether the debtor's "current situation is likely to continue or improve," including "whether the debtor has attempted to maximize his income by seeking or obtaining stable employment commensurate with his educational background and abilities," and "whether the debtor is capable of supplementing his income through secondary part-time or seasonal employment," even if already employed full time, id. at 1149-50; (4) whether the debtor's dependents "are, or could be,

contributing financially to their own support," id. at 1150; (5) the amount of the debt and the rate at which interest accrues, id. at 1149; and finally, (6) the debtor's "good faith," i.e. his role in allowing the debt to accrue including "previous efforts to repay the HEAL obligation, including the debtor's financial situation over the course of time when payments were due; the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding HEAL debt; and the percentage of the debtor's total indebtedness represented by student loans," id. at 1150.

This list, of course, is not exclusive, and bankruptcy courts should consider any additional factors arising in a given case that affect the determination of whether nondischarge would be shockingly unfair, harsh, or unjust, or otherwise unconscionable. In addition, we recognize the concern expressed by the dissenting judge in Smitley and the bankruptcy court in this case that lists of relevant factors can sometimes obscure the true function of a totality of the circumstances analysis by reducing it to a "rigid, formula-driven calculation." Smitley, 347 F.3d at 125 (Michael, J., dissenting); see Polleys, 356 F.3d at 1309 ("Legal rules have value only to the extent they guide primary conduct or the exercise of judicial discretion. Laundry lists, which may show ingenuity in imagining what *could* be relevant but do not assign weights or consequences to the factors, flunk the test of utility."). We caution, therefore, that courts should take care to view the debtor's situation as a whole, assigning more importance to

those factors the court determines to carry greater weight in a given debtor's circumstances.

Nevertheless, a court may not utilize its discretion to overcome Congress's requirement that debtors seeking discharge of HEAL loans meet a strict unconscionability standard. "Given the extreme nature of Congress' chosen standard for the discharge of HEAL loans, we believe that in all but the most difficult cases the question of whether the debtor has satisfied that standard will be obvious." In re Rice, 78 F.3d at 1150; see also id. at 1148 ("[W]e have little doubt that [Congress] intended to severely restrict the circumstances under which a HEAL loan could be discharged in bankruptcy.").

**C.** **Factors relevant to the discharge of Mr. Woody's HEAL loan obligation**

Consistent with the approach set out above, in this section we consider individually the factors related to Mr. Woody's situation that we find relevant to whether nondischarge of his HEAL loan would be unconscionable. We then synthesize these factors to address the totality of the circumstances in the following section. By doing so, we have endeavored to ensure that our analysis is tailored to Mr. Woody's situation as a whole and not merely a "rigid, formula-driven calculation." Smitley, 347 F.3d at 125 (Michael, J. dissenting).

1. *Mr. Woody's income, earning ability, educational background, and accumulated wealth*

Mr. Woody's financial situation, both currently and over the years since his loan payments first became due, carries great weight in determining whether his HEAL loan may be discharged. The bankruptcy court found that, although Mr. Woody's income varied in the past, it has increased markedly since he became employed by the I.R.S. in 2001; from an annual income that exceeded $15,000 in only a few years prior to 1998, Mr. Woody's earnings have steadily increased, reaching a projected gross income of $36,780 in 2005 and $38,520 in 2006. Mr. Woody also receives significant benefits from the I.R.S. in addition to his salary, including subsidized health insurance, 401(k) and TSP retirement savings programs, and access to a flexible spending account for his medical expenses.

As for Mr. Woody's educational background, he holds a bachelor's degree with a major in accounting and a minor in general business. His undergraduate education has apparently proven useful, at least in the later years of his professional life, as his successful employment with the I.R.S. appears to utilize the training and skills of his degree. He has not, however, accumulated significant wealth or many possessions; his retirement accounts contain approximately $10,000, he owns no real estate, and his sole personal possession of any value is his fifteen-year-old pickup truck.

We therefore observe that Mr. Woody appears to have an adequate earning capacity at present; with no dependents to support, he is able to utilize his entire annual income of nearly $40,000 to provide for his own needs. We recognize,

however, that these circumstances have not always existed, and specifically recognize that, prior to 1998, Mr. Woody earned significantly less than he did at the time of the bankruptcy court's judgment.

### 2. *Mr. Woody's age and health*

Another important factor in our calculus is the fact that Mr. Woody is approaching retirement age and suffers from a heart condition. Mr. Woody was 58 years old at the time of his bankruptcy trial, which would make him now closer to 60. As the bankruptcy court noted, he "is not a shining example of good health," as he has heart disease and "the medical fall-out associated with a recent heart attack." Mr. Woody also testified that he has conditions affecting use of his feet and hands, although these are not so significant as to prevent him from working.

His age and health conditions separate Mr. Woody from the debtors in Rice and Smitley, who were aged 41 and 47 respectively and were thus "relatively young as well as healthy." In re Rice, 78 F.3d at 1150; Smitley, 347 F.3d at 122. On the other hand, Mr. Woody's health is not presently so impaired as to interfere with his ability to maintain full time employment at the I.R.S.; the bankruptcy court found that Mr. Woody is able to work and his job does not exacerbate his health issues, although he cannot work overtime without risking adverse health effects. See In re Barrows, 182 B.R. at 647-49 (noting debtor's numerous physical problems, but refusing to discharge student loans including HEAL loans

- 17 -

because "not only must the debtor's physical, mental or financial limitations be permanent, they must be severe enough to prevent the obtainment of employment."); In re Soler, 261 B.R. 444, 460-64 (Bankr. D. Minn. 2001) (discharging debtor's HEAL loans, in part because chronic, acute back pain was exacerbated by her job as a dentist and meant that she could not work more hours or hope to increase her income); In re Kline, 155 B.R. 762, 768 (Bankr. W.D. Mo. 1993) (discharging debtor's HEAL loans, in part because of severe mental illness "which render[ed] her unable to function on a day-to-day basis and prevent[ed] her from maintaining employment for any significant time.").

Mr. Woody's age and health do not appear to significantly affect his present earning abilities. However, these circumstances are also relevant to whether his current situation is likely to continue or improve, a factor we consider next.

3. *Whether Mr. Woody's current situation is likely to continue or improve*

The bankruptcy court found that Mr. Woody's financial situation, though stable now, is likely to deteriorate in the future due to his age and health problems. This finding is supported by the evidence of Mr. Woody's ongoing health issues related to his heart condition and the fact that he is rapidly approaching typical retirement age.

We note, however, that Mr. Woody also conceded in his testimony that he can "probably" expect to receive annual increases in his salary based on the federal pay scale for "the next couple of years at least," as well as annual cost-of-living increases for as long as he remains at his I.R.S. position. Thus, while his long-term financial outlook remains uncertain, Mr. Woody can at least anticipate a stable or even increased salary in the immediate future.

Mr. Woody's financial outlook has already improved in another important sense: his accrued debt of over $53,000 from his 523 loans was discharged by the bankruptcy court, a decision that has not been appealed and is now final. We regard this discharge as a significant factor in assessing Mr. Woody's financial future, since it eliminated more than three-quarters of his educational debt. Mr. Woody now faces much less daunting payments than he would have if he was required to repay his entire debt.[7] See Smitley, 347 F.3d at 123 (holding that the fact that "Smitley's financial condition has improved because he has received a discharge of other debts" weighed in favor of nondischarge of his HEAL loan obligations).

4.    *Mr. Woody's expenses and his standard of living*

---

[7]The Rice and Smitley courts considered the amount of educational loan debt as a separate factor in their HEAL loan discharge analyses. See In re Rice, 78 F.3d at 1149; Smitley, 347 F.3d at 123. In our analysis of Mr. Woody's circumstances, however, we believe that the amount of outstanding loan debt is most important insofar as it affects his future prospects, and therefore we include it here as an element of whether his situation is likely to improve.

Viewed on a general level, we are inclined to agree with the bankruptcy court that Mr. Woody has maintained a reasonably frugal lifestyle and cannot be faulted for living extravagantly in the face of his mounting educational loan debt. However, to comport with the strict standard for discharge of HEAL loans under § 292f(g)'s unconscionability test, we "must necessarily be unforgivingly critical in [our] assessment of the debtor's claimed expenses." In re Rice, 78 F.3d at 1151. Casting a careful eye over Mr. Woody's budget, we cannot help but conclude that he currently makes monthly payments — and, in some cases, has been making these payments for many years — that are unnecessary to satisfy his basic living needs. We do not include Mr. Woody's expenditures on, for example, "recreation/entertainment," or "cable/satellite/internet" as unnecessary expenses; we agree with the bankruptcy court that people are not "robots" and require at least minimal opportunity for recreation and relaxation. Even so, we agree with the DOJ that certain of Mr. Woody's expenses are not so necessary as to take precedence over his obligation to repay his HEAL loan obligation.

First and foremost, Mr. Woody's budget includes $125 expended each month for rental of a storage space in which he stores furniture and office equipment. Mr. Woody claims to have rented this storage space since approximately 1990, and he conceded at his hearing that he has not used the furniture or equipment in storage since that time. He also conceded that the items in storage were worth "very little," and that the only reason he kept the items in

storage was "because it takes a certain amount of effort to clean [the storage unit] out and get rid of it." By any standard, this expense is entirely unnecessary; had Mr. Woody simply disposed of his unused furniture in 1990, he could have been contributing the monthly rental expense to his student loan debt instead and could have paid off a significant portion of his educational loan obligations.[8] This single expense therefore indicates that Mr. Woody's income, even before he obtained steady employment at the I.R.S., allowed for at least some repayment of his education loan debt without infringing upon his standard of living.

A second category of monthly expense that has been unnecessary to Mr. Woody's maintenance of a minimal standard of living is his contribution to his retirement savings accounts. To be sure, we agree with the principle that saving for one's retirement is a laudable goal that should generally be encouraged. However, we also agree with the many other courts that have held that, in the context of bankruptcy proceedings, retirement contributions should not take precedence over repayment of preexisting debts. "Voluntary contributions to retirement plans . . . are not reasonably necessary for a debtor's maintenance or support and must be made from disposable income. . . . [A]lthough investments may be financially prudent, they certainly are not necessary expenses for the

---

[8]The record does not indicate whether the cost of Mr. Woody's storage unit has been $125 per month since 1990, or whether that expense has increased with time. Regardless, however, it represents a significant amount of income that could have been directed towards repayment of Mr. Woody's loans without affecting his standard of living in the slightest.

support of the debtors or their dependents.  Investments of this nature are therefore made with disposable income; disposable income is not what is left after they are made." In re Anes, 195 F.3d 177, 180-81 (3d Cir. 1999); accord In re Harshbarger, 66 F.3d 775, 778 (6th Cir. 1995) ("[I]t would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend." (quotation omitted)); In re Perkins, 318 B.R. 300, 306-07 (Bankr. M.D.N.C. 2004) (holding that "401(k) contributions generally are not regarded as reasonably necessary for the support or maintenance of a debtor and thus may be considered as available income from which a debtor seeking a § 523(a)(8) undue hardship discharge could use to repay an educational loan" and collecting supporting cases).

Mr. Woody's 2005 budget included $210 per month in pre-tax contributions to his 401(k) retirement plan.  In addition, he budgeted $85 per month towards repayment of a $2,500 thrift savings plan ("TSP") loan which he had obtained in the year prior to his loan discharge hearing; Mr. Woody explained that he took out the TSP loan in order to place more money in his IRA accounts in order to benefit from the increased investment flexibility in those accounts, a decision that was entirely discretionary on his part.  Thus, between these two expenses, Mr. Woody pays $295 per month towards voluntary retirement contributions.  While these payments will no doubt benefit Mr. Woody in the long run, they represent

expenses that should not have taken precedence over his obligation to repay his HEAL loan.

In addition, we note that there are other sundry expenses in Mr. Woody's monthly budget that, while perhaps individually de minimis, nevertheless appear unnecessary to maintenance of his standard of living. For example, Mr. Woody testified that he voluntarily pays approximately $26 per month for additional life insurance beyond that provided by his employer, yet he has no dependents or spouse to benefit from such additional insurance. He pays $26 per month in union dues, though he is not required to belong to a union as part of his work. He budgets $25 each month towards charitable contributions. And finally, Mr. Woody's 2006 estimated budget predicted a monthly surplus of $79 after paying all budgeted expenses — income that is earmarked for no particular purpose and, thus, could certainly be used to make payments towards his HEAL loan debt.

The bankruptcy court similarly concluded that several of Mr. Woody's monthly expenses were unnecessary to maintenance of his standard of living. However, the court also found that Mr. Woody's estimates of many of his necessary expenses were "unrealistically low," and that the true cost of living would eventually force Mr. Woody to redirect his income towards these necessary expenses. For example, the court noted that Mr. Woody had not budgeted for "miscellaneous expenses or unexpected health care expenses," nor had he factored in the likelihood that he would need to replace his aging vehicle in the future.

According to the bankruptcy court, "[r]aising Mr. Woody's unrealistically low estimated expenses to realistic levels will ultimately deprive him of the ability to continue making payments toward voluntary expenses that are unnecessary for him to maintain his minimal, if not meager, lifestyle."

We do not dispute the bankruptcy court's finding that Mr. Woody may have underestimated some of his expenses. As part of the "unforgivingly critical" assessment of a HEAL loan debtor's expenses, In re Rice, 78 F.3d at 1151, the court was required to carefully examine Mr. Woody's budget, including whether it realistically represented his actual needs. And it is of course well established that the court has the ability to take judicial notice of such verifiable facts as the rising price of gasoline. See York v. American Tel. & Tel. Co., 95 F.3d 948, 958 (10th Cir. 1996) ("Judicial notice is appropriate where a matter is verifiable with certainty." (quotation omitted)). Thus, the bankruptcy court's finding that Mr. Woody's budget failed to include likely future expenses was within the purview of the court's analysis and was not clearly erroneous.

However, we differ with the bankruptcy court over the effect of this finding on the unconscionability analysis. While Mr. Woody's budget may fail to account for future changes in his expenses — an important factor to note — the fact remains that through at least the time of the bankruptcy proceeding, Mr. Woody managed to maintain his standard of living while making the payments discussed above that we deem unnecessary. For example, though Mr. Woody

experienced some very lean years when his income was only a fraction of what it is now, he has nevertheless managed to set aside enough money each month since 1990 to pay the rent for a space to store his unused furniture. Thus, although we agree that Mr. Woody's budget indicates that he is likely to face increased financial strain in the future, we also interpret it as evidence that to date, he has earned sufficient income to have made significant payments on his HEAL loan obligations, had he chosen to do so. In other words, the fact that Mr. Woody may find himself in financial trouble in the future does not erase the fact that, in the present and the past, his income and standard of living permitted him to make loan payments.

     5.    *Mr. Woody's responsibility for his debt and whether he made good faith efforts to repay his HEAL loan debt*

The final factor we consider is one to which the bankruptcy court gave great weight: Mr. Woody's good faith efforts to repay his HEAL loan obligations. We agree that a debtor's good faith efforts at repayment over the life of his loans are an important part of an unconscionability analysis. However, unlike the bankruptcy court, we conclude that the record demonstrates that despite Mr. Woody's ability to make at least minimal payments, he made almost no effort to do so. Thus, we cannot conclude that he has acted in good faith regarding his HEAL loan obligations.

The bankruptcy court acknowledged that Mr. Woody's total contribution towards repayment of his HEAL loan was a single payment of $484.48, made in 1987. The court also noted that Mr. Woody never participated in any kind of repayment program, making only "sporadic" attempts to initiate conversations with loan representatives that never resulted in any concrete progress towards repayment. Nevertheless, the bankruptcy court concluded that Mr. Woody had acted in good faith because his failure to meet his loan obligations was not borne of any desire to abuse the system: "despite reasonable efforts on his part, he was unable to earn income sufficient to reasonably warrant any attempt at repayment." Thus, the court concluded, "[t]he equities of this case weigh in favor of Mr. Woody's good faith, and this Court will not condemn him because he is unable to afford repayment of the obligation despite his best efforts."

However, the fact that Mr. Woody is likely to encounter increased expenses into the future does not change the fact that, in the past as well as at present, he could have applied income towards his educational loans rather than, for example, furniture storage. Had Mr. Woody applied $125 per month since 1990 to loan payments rather than furniture storage, he would have shown a significant effort to repay his educational loan debts.

Under these circumstances, we do not agree that Mr. Woody's minimal efforts to repay his HEAL loan constitute good faith. The Rice and Smitley courts define the good faith inquiry as focusing in relevant part upon "the

debtor's financial situation over the course of time when payments were due," and "the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding HEAL debt." In re Rice, 78 F.3d at 1150; Smitley, 347 F.3d at 118. Here, Mr. Woody's financial situation since his HEAL loan payments began to come due would have permitted some contribution towards this obligation, yet Mr. Woody instead chose to make voluntary payments towards other expenses. Thus, the bankruptcy court's finding that Mr. Woody endeavored to repay his loan obligation in good faith is clearly erroneous.

### D. The totality of Mr. Woody's circumstances does not permit discharge of his HEAL loan debt

The above factors paint a picture of Mr. Woody as a man who has struggled to earn a decent income for much of his life, but who has in recent years found employment that utilizes his skills and provides him with a reasonable income. He has lived a relatively frugal existence, but has also chosen to devote a portion of his income to certain expenses that were not necessary to maintain his standard of living. While he was aware of the significant debts he had accrued in educational loans, he made very little effort to address these obligations and has effectively allowed them to languish for more than two decades. Mr. Woody no longer need worry about the majority of these loans, as $53,000 in 523 loan debt — more than three-quarters of his total educational loan obligation — has already been discharged in bankruptcy. Mr. Woody now finds himself approaching

retirement age, making a decent income for the time being but concerned about his lack of retirement savings and the potential for expensive health problems in the future. He therefore requests that we affirm the bankruptcy court's discharge of his remaining HEAL loan debt of approximately $18,750.

Under these circumstances — in particular, Mr. Woody's present level of income and his lack of effort to make payments toward his educational loans despite the apparent availability of funds from which he could have done so — nondischarge of his HEAL loan debt would not be "excessive" or "exorbitant," nor would it "[lie] outside the limits of what is reasonable or acceptable," or be "shockingly unfair, harsh, unjust," or "outrageous." While we do not doubt that Mr. Woody faces financial difficulty in the future based on his age, health, and lack of significant retirement savings, we cannot ignore the fact that he has gained steady, full-time professional employment and yet has failed to confront in good faith the obligation that he assumed when he accepted a HEAL loan, a failure that persisted even as he put away money for his own retirement and undertook voluntary expenses such as furniture storage, union membership, charitable contributions, and excess life insurance. In enacting the strict unconscionability standard for discharge of HEAL loan obligations, Congress "intended to severely restrict the circumstances under which a HEAL loan could be discharged in bankruptcy." In re Rice, 78 F.3d at 1148. We do not think that Congress intended the discharge provision in § 292f(g) to allow a debtor to spend

decades without making loan payments, even after having worked full time for several years, then to receive a discharge of his HEAL loan obligations because his health begins to fail as he approaches retirement age.

We therefore hold that the totality of Mr. Woody's circumstances do not indicate that nondischarge of his HEAL loan debt would be unconscionable. The BAP thus erred in affirming the bankruptcy court's discharge of this debt under § 292f(g). We REVERSE the bankruptcy court's and the BAP's judgments and order Mr. Woody's outstanding HEAL loan obligation reinstated.

## CONCLUSION

For the foregoing reasons, we hold that Mr. Woody's circumstances do not satisfy the strict unconscionability standard for discharge of HEAL loan obligations under § 292f(g). The BAP's opinion affirming the bankruptcy court's discharge of Mr. Woody's HEAL loan debt is therefore REVERSED, and Mr. Woody's outstanding obligation on this debt is reinstated. This matter is REMANDED to the BAP with instructions to remand to the bankruptcy court for further proceedings consistent with this opinion.